No. 11 May 4, 2023 23

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE ex rel Ellen F. ROSENBLUM,
in her official capacity as Attorney General
for the State of Oregon,
*Petitioner on Review,*

*v.*

LIVING ESSENTIALS, LLC,
a Michigan limited liability company;
and Innovation Ventures, LLC,
a Michigan limited liability company,
*Respondents on Review.*

(CC 14CV09149) (CA A163980) (SC S068857)

On review from the Court of Appeals.*

Argued and submitted May 5, 2022.

Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Michael J. Sandmire, Buchalter Ater Wynne, Portland, argued the cause and filed the brief for respondents on review. Also on the brief was Rachel C. Lee, Stoel Rives LLP, Portland.

Chris Mertens, Mertens Law, LLC, Portland, filed the brief for *amicus curiae* Oregon Consumer Justice.

Nadia H. Dahab, Sugerman Dahab, Portland, and John W. Stephens, Esler Stephens & Buckley, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Paloma Sparks, Oregon Business & Industry, Salem, filed the brief for *amicus curiae* Oregon Business & Industry Association.

_____

* On appeal from the Multnomah County Circuit Court, Kelly Skye, Judge. 313 Or App 176, 497 P3d 730 (2021).

Before Flynn, Chief Justice, Duncan, Garrett, and DeHoog, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.**

GARRETT, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

_____

** Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. Bushong and James, JJ., did not participate in the consideration or decision of this case.

**GARRETT, J.**

This case arises under the Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.656.[1] The UTPA sets out an extensive list of unlawful business practices that the legislature has deemed harmful to Oregon consumers, and it provides for public and private enforcement actions.

The Attorney General brought this action against defendants, alleging that they had made representations about their products that violated two different provisions of the UTPA. The trial court ruled for defendants, explaining that the relevant provisions of the UTPA required the state to prove that the misrepresentations were "material to consumer purchasing decisions," and that the state had not done so. The Court of Appeals affirmed that decision. *State ex rel Rosenblum v. Living Essentials, LLC*, 313 Or App 176, 497 P3d 730 (2021). We allowed the state's petition for review to consider whether the lower courts correctly construed the statute. As explained below, we conclude, contrary to the trial court and the Court of Appeals, that the UTPA provisions at issue contain no "material to consumer purchasing decisions" requirement. We also reject defendants' argument that, without such a requirement, the provisions facially violate the free speech provisions of the state and federal constitutions. Accordingly, we reverse the decision of the Court of Appeals and remand to that court for further proceedings.

## I.  BACKGROUND

A.  *The UTPA Generally*

We begin with a brief overview of the statute, including procedural requirements relevant to the issues on review. The UTPA is a comprehensive statute that protects consumers from unlawful trade practices. *State ex rel Redden v. Discount Fabrics*, 289 Or 375, 382, 615 P2d 1034

---

[1] This case was brought in 2014. ORS 646.608, ORS 646.607, and ORS 646.605, which are all part of the UTPA, have been amended since then. However, those amendments did not affect the provisions at issue in this case, and they do not affect our analysis. Therefore, all references in this opinion to chapter 646 of the Oregon Revised Statutes are to the current version of the statute unless stated otherwise.

(1980). The UTPA includes an extensive list of trade practices that are unlawful. ORS 646.607, ORS 646.608(1).

The UTPA is enforceable by private parties and by public prosecuting attorneys, including the Attorney General and local district attorneys. ORS 646.632 (public enforcement); ORS 646.638 (private civil actions); *Discount Fabrics*, 289 Or at 384-86 (discussing the differences in the elements to be proved and the burden of proof between the two types of actions). Public officials may bring an action in the name of the state to enjoin violations, seek restitution for individuals deprived of money or property, and seek civil penalties for willful violations of an injunction, voluntary compliance agreement, or the UTPA's listed practices. ORS 646.642; *Discount Fabrics*, 289 Or at 382 n 6.

In a public action, the prosecuting attorney must have probable cause to believe that a person "is engaging in, has engaged in, or is about to engage in" an unlawful trade practice. ORS 646.632(1). Before filing suit, the prosecuting attorney must provide notice to the person to be charged. ORS 646.632(2). Notice must include the alleged unlawful practice and the relief sought. *Id.* After receiving notice, the person to be charged has 10 days to respond to the prosecuting attorney with an "assurance of voluntary compliance" (AVC). *Id.* The AVC must describe the actions, if any, that the person to be charged will take to ameliorate the alleged unlawful practice. *Id.* The AVC is not an admission of a violation. *Id.* The prosecuting attorney, if satisfied with the AVC, can submit it to the court for approval and filing with the clerk of the court, if approved. *Id.* An AVC constitutes a judgment in favor of the state. *Id.* Once approved by and filed with the court, a violation of the AVC constitutes contempt of court. ORS 646.632(4).

The prosecuting attorney may reject an AVC as unsatisfactory if the AVC "does not contain a promise to make restitution in specific amounts or through arbitration," or if the AVC "does not contain any provision * * * which the prosecuting attorney reasonably believes to be necessary to ensure the continued cessation of the alleged unlawful trade practice, if such provision was included in a proposed assurance attached to the notice." ORS 646.632(3). If the AVC is

rejected as unsatisfactory, the prosecuting attorney may initiate a civil action. *See* ORS 646.632 (providing that a prosecuting attorney may bring suit in the name of the state after complying with the notice and AVC requirements).

B.   *Historical Facts*

We take the following undisputed facts from the opinion of the Court of Appeals and from our own review of the record.

Defendants manufacture, market, and sell 5-hour ENERGY, a beverage sold at retail in two-ounce bottles throughout the United States. Defendants advertise 5-hour ENERGY to consumers, including in Oregon, through radio, television, internet, and print media. The drink is available in "Original," "Extra-Strength," and "Decaf" versions. The Original formula contains 200 milligrams of caffeine per bottle, Extra-Strength has 230 milligrams of caffeine, and Decaf has 6 milligrams of caffeine. Each version also contains a proprietary blend of noncaffeine ingredients, including B-vitamins, amino acids, and other ingredients.

This action concerns certain representations that defendants made in Oregon about the characteristics of 5-hour ENERGY. Advertisements stated that the noncaffeine ingredients in the Original and Extra-Strength formulas provide extra energy, alertness, and focus. Specifically, the advertisements stated that 5-hour ENERGY "contains a powerful blend of B-vitamins for energy, and amino acids for focus"; that it "is packed with B-vitamins for energy, and amino acids for a sharp, focused mind"; and that it "contains a healthy powerful blend of B-vitamins for energy, amino acids for focus and better mood, and enzymes to help you feel it fast." Advertisements also stated that the Original and Extra-Strength formulas provide more energy than an equivalent amount of caffeine. Specifically, advertisements stated that 5-hour ENERGY products have "less caffeine than some Starbucks coffees, plus it has vitamins and nutrients." Defendants advertised the Decaf formula as providing alertness and focus, attributing those benefits to the noncaffeine ingredients. Specifically, defendants' website advertised the Decaf formula as "contain[ing] B-vitamins

for energy and amino acids for focus, plus Choline," and stated that choline "is vital to the production of neurotransmitters in the brain that affect memory, intelligence and mood." Throughout this opinion, we will refer to the foregoing representations regarding the noncaffeine ingredients as the "NCI representations."

Defendants also ran an "Ask Your Doctor" advertising campaign, with statements that 5-hour ENERGY had "asked over 3,000 doctors" to review the product. Those advertisements claimed that "over 73%" of the doctors who reviewed the product would recommend it to their "healthy patients who use energy supplements." Throughout this opinion, we will refer to those representations as the "Ask Your Doctor campaign."

The state initiated this action, alleging, as relevant to the issues on review, that the foregoing representations violated two provisions of the UTPA, ORS 646.608(1)(b) and (1)(e).[2] Those provisions state, respectively, that

"(1)   A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b)   Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(e)   Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation or connection that the person does not have."

ORS 646.608(1). The state alleged that defendants violated paragraph (1)(e) by representing that the noncaffeine ingredients in 5-hour ENERGY provide energy and alertness, when those ingredients do not have those effects. The state further alleged that defendants' "Ask Your Doctor" campaign

_____

[2] The state alleged other UTPA violations that are not at issue on review.

violated both paragraphs (1)(b) and (1)(e) by falsely implying that doctors approved of 5-hour ENERGY. The state sought equitable relief and civil penalties.

Before filing suit, the state notified defendants of the alleged violations, as required by ORS 646.632(2), and defendants submitted an AVC in response. The AVC promised, generally, that defendants would comply with the UTPA, and, specifically, that defendants would refrain from making "material representations that are false or mislead consumers acting reasonably to their detriment." The AVC also offered to pay $250,000 to the state to use "as allowed by law, including, but not limited to, restitution, consumer education, the Consumer Protection & Education Account established pursuant to ORS 180.095, or charitable purposes." The state rejected the AVC and subsequently filed its complaint as allowed by ORS 646.632(1), alleging that the AVC was inadequate under ORS 646.632(3). The state took the position that the AVC was not satisfactory because it contained only a promise to refrain from "material" misrepresentations that "misled consumers acting reasonably to their detriment," while, in the state's view, the relevant statutory provisions do not contain that qualification.

Following a bench trial, the trial court ruled in favor of defendants on all claims. In its written findings of fact and conclusions of law, the trial court listed the elements that the state needed to prove to succeed on its claim under ORS 646.608(1)(b) and (1)(e). One element, according to the trial court, of a paragraph (1)(b) claim for causing likelihood of confusion as to source, sponsorship, approval, or certification, was that the defendants' conduct "caused confusion or misunderstanding that was material to consumer purchasing decisions." Under paragraph (1)(e), the misrepresentation provision, the trial court stated that one required element was that defendants "made representations that were material to consumer purchasing decisions."

With respect to the state's paragraph (1)(e) claims based on the NCI representations, the trial court found that some of the representations were not inherently false and that other representations were nonactionable "puffery."

It found that the nonpuffery representations "may imply falsely the effect of the specific [noncaffeine ingredients] in a bottle of [5-hour ENERGY] and the expected effect of five hours of energy," but it did not make particularized findings of falsity because of its ruling on materiality. The trial court also found that, for all formulas, none of the NCI representations was "willful," as required for the imposition of civil penalties.[3] The court then found that, for the Original and Extra-Strength formulas, none of the NCI representations "materially influence[d] consumer purchasing decisions." Because the trial court found that the state had failed to satisfy that materiality element for the Original and Extra Strength formulas, and the willfulness element for all three formulas, it ruled that the state had failed to establish that any NCI representation violated ORS 646.608(1)(e).

With respect to the state's paragraph (1)(b) and (1)(e) claims based on the "Ask Your Doctor" campaign, the trial court explained that there was "some evidence that the ads could be misleading," but it ultimately found that the representations at issue were not substantively misleading or confusing, nor were they material to consumer purchasing decisions. Thus, the court ruled for defendants on those counts.

Defendants requested approximately $2 million in attorney fees under ORS 646.632(8), which provides for mandatory attorney fees if a defendant prevails and if the court finds that the AVC was satisfactory and had been submitted in good faith to the prosecuting attorney. The trial court denied that request in a supplemental judgment, finding that the AVC was not satisfactory because the state's interpretation of the UTPA in rejecting the AVC had been reasonable at the time the AVC was submitted.

---

[3] The UTPA provides that a showing of a "willful" violation is required for the imposition of civil penalties whether an action is brought by a private party, ORS 646.638(1), or by a public prosecuting attorney, ORS 646.642(3). Willfulness is not an element of a violation of ORS 646.608(1), however. Thus, the trial court's ruling on willfulness is not pertinent to the questions we address on review, which concern whether ORS 646.608(1)(b) and (1)(e) require a showing of materiality to consumer purchasing decisions and, if they do not, whether those provisions are unconstitutional.

C.  *The Appeal*

On appeal, the state raised seven assignments of error to the trial court's rulings on the merits. Among those assignments, the state argued that the trial court (1) erred by construing ORS 646.608(1)(b) and (1)(e) to include a materiality element; (2) applied the wrong legal standard for willfulness; (3) applied the wrong legal standard for a misrepresentation under paragraph (1)(e); and (4) applied the wrong legal standard for a likelihood of confusion or misunderstanding under paragraph (1)(b). Defendants cross-appealed the trial court's denial of attorney fees. The Court of Appeals affirmed the trial court's judgment on the merits and reversed the supplemental judgment denying attorney fees. *Living Essentials, LLC*, 313 Or App at 218-19.

The Court of Appeals agreed with the trial court that "material to consumer purchasing decisions" is a required element of both ORS 646.608(1)(b) and (1)(e). As to paragraph (1)(b), the Court of Appeals interpreted the phrase "cause[s] likelihood of confusion or of misunderstanding" by consulting dictionary definitions of those words, then reasoning that, to meet that standard, "the unlawful conduct *necessarily* must be material to the consumer's decision to buy the product." *Id.* at 187 (emphasis in original).

Turning to ORS 646.608(1)(e), the court interpreted the text to prohibit making misleading assertions "about various attributes that, by their nature, *can* have the potential to affect a purchasing decision," but noted that the text "does not expressly say whether it is limited to attributes that actually do have that potential, or whether it reflects a legislative judgment that *every* misrepresented characteristic— regardless of how innocuous—has the potential to mislead and should constitute a violation of the UTPA." *Id.* at 188 (emphases in original).

The Court of Appeals then consulted statutory context and legislative history, ultimately finding further support for the conclusion that paragraphs (1)(b) and (1)(e) both contain an implicit element of materiality. The court noted that the UTPA regulates "trade" and "commerce," which are defined as "directly or indirectly affecting the people of this

state," a qualifier that the court took to indicate that "the acts to be remedied as unlawful trade practices are ones that have affected consumers—in other words, ones that materially bear on consumer purchasing choices." *Id.* at 188-89.

As to the legislative history, the Court of Appeals explained that the UTPA was "largely borrowed" from the Uniform Deceptive Trade Practices Act (UDTPA), which, in turn, was derived from the federal Lanham Trademark Act and the *Restatement (Second) of Torts*. *Id.* at 191-92. The court found those sources instructive, explaining that the Lanham Act "contemplate[s] that the prohibited deception be material to a consumer's purchasing decisions." *Id.* at 193. On the whole, the court concluded, it was

> "difficult to imagine how making actionable *immaterial* misrepresentations under ORS 646.608(1)(b) and (e) would serve to accomplish the purpose of the UTPA to prevent consumers from harm. There is no need to provide a remedy for misrepresentations that are irrelevant to consumers' purchasing decisions to accomplish the goal of protecting consumers."

*Id.* at 194 (emphasis in original). Observing, finally, that construing ORS 646.608(1)(b) and (1)(e) not to require materiality would raise concerns under Article I, section 8, of the Oregon Constitution, the Court of Appeals concluded that materiality is required. *Id.* at 194-96. That conclusion made it unnecessary for the court to address the state's other assignments of error described above.[4]

The state petitioned for review, which we allowed.

## II. STATUTORY CONSTRUCTION

The question before us involves the trial court's interpretation of ORS 646.608(1)(b) and ORS 646.608(1)(e). Specifically, the question is whether those provisions contain

---

[4] The Court of Appeals also addressed defendants' cross-appeal, which challenged the trial court's denial of attorney fees. Because the AVC promised to pay $250,000 to the state for "restitution," among other purposes, and it stated that defendants would comply with Oregon law, the Court of Appeals concluded that the AVC was satisfactory as a matter of law. Accordingly, the court reversed the trial court's denial of attorney fees and remanded to the trial court for a determination of the amount of fees due to defendants.

an implicit requirement that defendants' acts were "material to consumer purchasing decisions."[5] Issues of statutory construction present questions of law that we review for legal error. *State v. Ramoz*, 367 Or 670, 704, 483 P3d 615 (2021). We resolve those questions by seeking to give effect to the intent of the legislature as demonstrated by the text, context, and any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

The statutory provisions at issue are ORS 646.608 (1)(b) and (1)(e). Again, those provisions state:

"(1)   A person engages in an unlawful practice if in the course of the person's business, vocation or occupation, the person does any of the following:

"* * * * *

"(b)   Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(e)   Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation or connection that the person does not have."

ORS 646.608(1). The dispute in this case is whether those provisions contain an implicit additional requirement—that is, whether they require proof that the "likelihood of confusion or of misunderstanding," in paragraph (1)(b), or the "represent[ation]," in paragraph (1)(e), would be "material to consumer purchasing decisions." We will briefly summarize the parties' arguments before examining the text, context, and legislative history.

The state contends that the Court of Appeals erred in construing both provisions to include a "material to consumer purchasing decisions" requirement. The state

---

[5] Neither party develops an argument explaining whether this element, if it existed, would refer to a reasonable consumer, a specific consumer, or a group of consumers. Because we reject defendants' argument regarding materiality altogether, we need not address that question.

observes that no such requirement is expressly contained in the text, and it disagrees with the Court of Appeals' conclusion that that requirement is implicit in the words that the legislature chose. The state contends that paragraphs (1)(b) and (1)(e) describe practices, among numerous others in the UTPA, that the legislature identified as hostile to consumers' interests and therefore inherently objectionable, regardless of how they may contribute to a consumer's purchasing decision in a particular context. The state also points out that the UTPA allows for both public enforcement by prosecuting attorneys and private enforcement by injured consumers, and that public enforcement actions, unlike private actions, do not require proof of concrete injury.

Defendants' response tracks the reasoning of the Court of Appeals. Defendants argue that, as a textual matter, paragraphs (1)(b) and (1)(e) implicitly require a showing that the act was "material to consumer purchasing decisions," and that such a requirement is supported by the context and purpose of the UTPA, as evidenced by the legislative history. Defendants argue that the UTPA regulates trade, which it defines in part as "directly or indirectly affecting" Oregonians, and that the legislature did not have an interest in prohibiting conduct that would not materially affect consumers by influencing their decisions about whether to purchase goods, real estate, or services.

A.   *Text*

We begin with the text, as that is the best evidence of legislative intent. *Gaines*, 346 Or at 171-72.

Starting with paragraph (1)(b), the text supports the state's view that materiality is not a requirement. That provision states that a person engages in an unlawful practice if the person "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services." ORS 646.608(1)(b). The text is addressed to a "likelihood of confusion or of misunderstanding" about the listed attributes; it says nothing expressly about whether the potential confusion or misunderstanding must be of the sort that would materially affect a consumer's purchasing decision. We thus consider whether that additional element is necessarily implied by the words

that the legislature chose. As the legislature did not define those terms for purposes of the statute, we presume that the legislature intended for them to have their ordinary meanings. *See Gaines*, 346 Or at 171.

The key phrase in the statute is "[c]auses likelihood of confusion or of misunderstanding." ORS 646.608(1)(b). When used as a verb, as here, "cause" means "1 : to serve as cause or occasion of : bring into existence : make" or, "2 : to effect by command, authority or force." *Webster's Third New Int'l Dictionary* 356 (unabridged ed 2002). "Cause" is also a legal term of art, and it is defined as "[s]omething that produces an effect or result." *Black's Law Dictionary* 273 (11th ed 2019). We understand the first *Webster's* definition and the *Black's* definition to refer to the same thing: the catalyst in a cause-and-effect sequence. The second part of the *Webster's* definition seems inapposite here, as nothing in the statute suggests that any command, authority, or force is required to effect the "likelihood of confusion or of misunderstanding." Rather, the provision as a whole indicates that "causes" in paragraph (1)(b) simply refers to a cause-and-effect relationship. Thus, "causes" in paragraph (1)(b) means "to produce an effect or result" or "bring into existence."

"Likelihood" is defined as "probability <in all ~ it will rain>." *Webster's* at 1310. We thus understand the legislature to have used the phrase "causes likelihood of confusion or of misunderstanding" to mean that a person produces, creates, or brings about a probability that confusion or misunderstanding will occur.

The third relevant word is "confusion," which has multiple definitions, some of which are clearly not applicable here.[6] In context, the definitions that are potentially relevant are the following:

> "2 a : a state of being discomfited, disconcerted, chagrined, or embarrassed esp. at some blunder or check <his sister [was] overcome with ~ and unable to lift up her eyes –Jane Austen> b : state of being confused mentally : lack of

---

[6] Those definitions include "overthrow" and "defeat" as in the fall of a city; "a situation or condition marked by lack of order, system, arrangement"; and the legal definition of "a merging of two rights in one or of two apparently or really antagonistic interests in one." *Webster's* at 477.

certainty, orderly thought, or power to distinguish, choose, or act decisively **:** perplexity <slowly emerging from the mental ~ which followed the fall –Havelock Ellis> <present intellectual ~ and moral chaos of the world –John Dewey>[.]"

*Webster's* at 477.[7] Because the UTPA protects consumers by regulating commercial transactions in the marketplace, the references to a "lack of certainty" and the "power to distinguish, choose, or act decisively" seem more apt than the references to being "chagrined" or "embarrassed," although those are potentially relevant.

The final word in the phrase is "misunderstanding," which means:

"1 **:** a failure to understand **:** misinterpretation <the ~ which arose from reports of these golden palaces fired the imagination of Columbus –G.F. Hudson> 2 **:** disagreement, quarrel <the ~s between the two territories have grown during the emergency –Vernon Bartlett>."

*Webster's* at 1447. As between those definitions of "misunderstanding," the entire text of ORS 646.608(1)(b) suggests that former definition is more apposite; given the reference to "confusion" earlier in the statute, it seems more likely that the legislature was concerned with business practices that could lead consumers to have a failure of understanding or a misinterpretation as opposed to those that might lead to a disagreement or quarrel.

Considered together, then, the dictionary definitions suggest that ORS 646.608(1)(b) refers to conduct whereby a person (1) produces or brings about (2) a probability (3) that another person will experience either (i) a lack of understanding or a misinterpretation, or (ii) a state of being that involves mental confusion, or being discomfited or disconcerted, or a diminished ability to distinguish or choose,

---

[7] Related definitions include "3 a **:** an act of confusing, of mixing, pouring, blending, or heaping together in disorder with identities and distinctions blended <the ~ of tongues at the tower of Babel> <a ~ of history and poetry in his work> b **:** an act of mistaking one thing for another, of failing to note distinctions, and of falsely identifying <a formal ~ of poetry and painting –Irving Babbitt> <~ between public and private morality –D.W. Brogan>." *Webster's* at 477. However, those definitions, which focus on an "act" rather than an effect, fit poorly in the context of ORS 646.608(1)(b) and the UTPA as a whole, which are concerned with effects on consumers.

regarding (4) the "source, sponsorship, approval, or certification of real estate, goods or services." Nothing in those requirements implies that the representation must have a material influence on consumer purchasing decisions.

This is not the first case in which we have construed ORS 646.608(1)(b). In *Daniel N. Gordon, PC v. Rosenblum*, 361 Or 352, 367, 393 P3d 1122 (2017), ORS 646.608(1)(b) was applied to a law firm's debt collection practices. In that case, we explained that there are three elements to a claim under ORS 646.608(1)(b): (1) A "person" (2) "in the course of the person's business, vocation or occupation" (3) "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of real estate, goods or services." As to the third element, we examined the causal relationship required between the person's action and the resulting confusion. We explained that "the person must cause the likelihood of confusion or misunderstanding experienced by the other person." *Id.* at 369 (internal quotation marks omitted); *see id.* (interpreting the statute in the context of a company whose actions were likely to cause confusion about interest rates on debt and liability for attorney fees). We were not presented there with the question whether the statute includes a "materiality" requirement. We did say, however, that the elements of a violation of ORS 646.608 (1)(b) are "apparent on the face of the statute." *Id.* at 367.

In this case, the Court of Appeals held that the concept of materiality, though not apparent on the face of the statute, is necessarily implied:

> "[F]or a seller's unlawful trade practice to 'bring into existence' or 'effect by authority' a 'state of being discomfited, disconcerted, chagrined, or embarrassed' or a 'lack of certainty' or 'power to distinguish, choose, or act decisively' with respect to its product, the unlawful conduct *necessarily* must be material to the consumer's decision to buy the product. Said another way, if a seller's allegedly unlawful practice is immaterial to the consumers' purchasing decisions, it is unlikely to create a state of discomfort, chagrin, or uncertainty, or affect the consumer's power to distinguish, choose, or act decisively with respect to that product."

*Living Essentials, LLC*, 313 Or App at 187 (emphasis in original).

We disagree with that conclusion. As a logical matter, the question whether a consumer is confused about some attribute of a product is not necessarily connected to the question whether the consumer intends to purchase the product. For example, a consumer might be led by a false advertisement to form an incorrect understanding about the "certification" status of a product, a misunderstanding that will exist regardless of whether the consumer has any interest in purchasing the product. The proposition that the only statements *capable* of misleading are those that are material to the purchasing decision is not correct. In short, the plain text of ORS 646.608(1)(b) does not include a materiality requirement, and we are not persuaded that materiality is necessarily or logically implied by the words that the legislature used.

We take the same view of the second provision at issue, ORS 646.608(1)(e), which makes it an unlawful practice to "represent[]" that goods, services, [and] real estate have certain attributes that they "do not have" (or that a "person" has certain attributes that the person "does not have"). "Representation" is defined for purposes of the UTPA as "any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2). Thus, paragraph (1)(e) prohibits making misrepresentations (including a failure to disclose), by speech or conduct, about certain attributes of goods, services, real estate, or persons. That text flatly prohibits such misrepresentations without regard to their possible effect. It is therefore even less supportive than paragraph (1)(b) of the interpretation that such conduct is actionable only if it is "material to consumer purchasing decisions."

In sum, the text of ORS 646.608(1)(b) and (1)(e) supports the state's argument that the materiality element described by the Court of Appeals does not exist in either provision. We proceed to consider statutory context and, to the extent it is helpful, legislative history.

B.  *Statutory Context*

Context includes "other provisions of the same statute" and "the statutory framework within which the law

was enacted." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *Klamath Irrigation District v. United States*, 348 Or 15, 23, 227 P3d 1145 (2010) (internal quotation marks and citation omitted). Relevant context for ORS 646.608(1)(b) and (1)(e) thus includes the rest of ORS 646.608(1) as well as the rest of the UTPA.

The purpose of the UTPA is to protect consumers from unlawful trade practices. *See, e.g.*, *Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or 85, 90 n 4, 566 P2d 1177 (1977) ("[T]he bill seeks to protect consumers rather than businesses."). In fulfilling the purpose of protecting consumers, the legislature has prohibited an extensive list of trade and business practices in ORS 646.607 and ORS 646.608(1).

Defendants' primary contextual argument is that the UTPA is aimed at restricting acts that "affect" Oregon consumers, as reflected in the statute's definitions of trade and commerce:

> "'Trade' and 'commerce' mean advertising, offering or distributing, whether by sale, rental or otherwise, any real estate, goods or services, and include any trade or commerce directly or indirectly affecting the people of this state."

ORS 646.605(8). Defendants argue that "affect" means "to act upon" or "to produce a material influence upon or alteration in." In support of inferring a materiality requirement in ORS 646.608(1)(b) and (1)(e), the Court of Appeals relied on that definition of "trade" and "commerce" as well as two of the UTPA's remedial provisions. ORS 646.632(1) allows a prosecuting attorney to bring suit to restrain "unlawful trade practices," and ORS 646.636 allows a court to order equitable relief to "restore" to a person money or property "of which the person was deprived" by means of an unlawful practice or "as may be necessary to ensure cessation of unlawful trade practices." The Court of Appeals reasoned that, in light of those provisions, "the UTPA 'as a whole' appears to envision that the acts to be remedied as unlawful trade practices are ones that have affected consumers— in other words, ones that materially bear on consumer purchasing choices." *Living Essentials, LLC*, 313 Or App at 189.

We agree with the Court of Appeals that the UTPA as a whole reflects an intent to regulate trade practices that affect consumers. But it does not follow that the legislature considered the only practices that affect consumers to be those that would materially influence their purchasing decisions as to a particular good or service. The legislature could have determined that practices that lead to confusion or inaccurate perceptions about goods and services have negative effects on a well-functioning marketplace, *e.g.*, by undermining consumer confidence, and that those negative effects indirectly "affect" consumers regardless of whether consumers purchase a good or service. To put it another way, one can understand the UTPA as a legislative judgment that the specified unlawful practices are *inherently* "material" in the sense that they are all adverse to the societal interest in a healthy marketplace where consumers can expect goods and services to be as they are represented to be. Consequently, the reference in the definition of "'trade' and 'commerce'" to "directly or indirectly affecting the people of this state" does not suggest that we should construe specific prohibitions in the UTPA to include additional requirements of materiality that are not expressed in their text. The more obvious contextual reading is that the legislature stated its general intention to regulate practices that affect consumers and then provided a list of specific unlawful practices that, in the legislature's judgment, do that.

That conclusion is also consistent with this court's decision in *Searcy v. Bend Garage Company*, 286 Or 11, 592 P2d 558 (1979), where we considered whether a different UTPA provision, ORS 646.608(1)(f), includes a "materiality" element. That provision makes it a violation to "[r]epresent[] that real estate or goods are original or new if the real estate or goods are deteriorated, altered, reconditioned, reclaimed, used or secondhand." The plaintiff bought a used car from defendant, who had checked a box on a sales form indicating that the car was new. The defendant argued that the plaintiff had not relied on that misrepresentation. *Searcy*, 286 Or at 15. Based on that argument, the defendant requested the following jury instruction:

> "A representation is an actual definite statement or actual definite conduct that is *material* and that was relied upon by

the plaintiffs. It can also include concealment of a *material* fact that would normally have been relied upon by the plaintiffs and that defendant had a duty to disclose to plaintiffs."

*Id.* at 16 (emphases in original). The defendant argued that the term "representation" in paragraph (1)(f) requires materiality because materiality is expressly required by another provision, ORS 646.608(1)(t), which prohibits the failure to disclose a "known material defect or material nonconformity" upon delivery of real estate, goods, or services. This court rejected that view. *Searcy*, 286 Or at 16 ("Many of the enumerated unlawful trade practices involve representations. *See* ORS 646.608(1)(e), (f), (g), (j), (k), (l), and (s). But in the section defining 'representation' the legislature did not require that a concealed fact be material.").

Defendants note that *Searcy* addressed a different UTPA provision, paragraph (1)(f); that it dealt with a jury instruction rather than the substantive elements of a claim; and that *Searcy* has "no bearing" on whether materiality is required for paragraphs (1)(b) and (1)(e). But *Searcy* is not so easily ignored. Defendants are correct that that case, strictly speaking, involved the correctness of the trial court's jury instruction about the meaning of "representation." But this court's conclusion that the instruction was correct, despite the omission of a reference to materiality, depended in part on its observation that ORS 646.608(1)(f), like several other provisions *including* paragraph (1)(e), prohibits certain representations without regard to materiality.

*Searcy* does not control our interpretation of paragraph (1)(e), but reading a materiality element into that paragraph would be difficult to reconcile with *Searcy*'s interpretation of paragraph (1)(f), which has a similar construction. Both provisions prohibit making inaccurate representations about a product or service. Neither provision expressly contains a materiality element. Ultimately, defendants offer no persuasive reason why this court should take a different view of one provision than we took of the other in *Searcy*.

C.  *Legislative History*

Thus far, we have concluded that the plain text and context of paragraphs (1)(b) and (1)(e) are inconsistent with

the inclusion of a materiality element. In that light, legislative history is likely to be unavailing. *Gaines*, 346 Or at 172 ("[W]e clarify that a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it.").

Tracking the analysis of the Court of Appeals, defendants argue that the UTPA provisions at issue were taken from the UDTPA, and that it was understood at the relevant time (*i.e.*, 1971) that the UDTPA requires materiality. For several reasons, that argument fails.

It is true that, in enacting the UTPA in 1971, the legislature adopted language from numerous provisions of the UDTPA, promulgated by the Uniform Law Commission. *See* Or Laws 1971, ch 744, § 7; Tape Recording, House Committee on Judiciary, HB 1088, Feb 10, 1971, Tape 5, Side 1 (statement of Attorney General Lee Johnson).[8] The UTPA provisions at issue here, ORS 646.608(1)(b) and (1)(e), were drawn from the list of deceptive trade practices in the UDTPA.[9] Those UDTPA provisions, however, do not contain a "materiality" requirement in their text, nor does the written commentary to those provisions refer to such a requirement. *See* Exhibit 5, House Committee on Judiciary, Subcommittee on Consumer Protection, HB 1088, Apr 5,

---

[8] A digitized version of that tape recording is available at http://records.sos.state.or.us/ORSOSWebDrawer/Record/7812750 (accessed Apr 25, 2023).

[9] The UTPA was based on more than one model statute, but it appears clear that the list of prohibited practices came in part from the UDTPA. Tape Recording, Senate Committee on Consumer Affairs, SB 50, Feb 3, 1971 (statement of Sen Willner), *available at* http://records.sos.state.or.us/ORSOSWebDrawer/RecordHtml/7359889 (accessed Apr 25, 2023) (discussing the three sources of model consumer legislation, which were the Council of State Governments, the Federal Trade Commission's model act, and the National Consumer Law Center's "Consumer Act"). When considering House Bill (HB) 1088, the legislature had a copy of the commentary to the UDTPA, annotated with the paragraph designations in the bill that corresponded to the 13 practices listed in the UDTPA. *See* Exhibit 5, House Committee on Judiciary, Subcommittee on Consumer Protection, HB 1088, Apr 5, 1971 (annotated excerpt from UDTPA). The other model consumer legislation statutes did not contain a specific list of prohibited practices, but prohibited "deceptive practices" generally. *See* 15 USC §§ 41-58 (1970) (Federal Trade Commission Act) ("[U]nfair or deceptive acts or practices in commerce, are declared unlawful."); Carolyn L. Carter & Jonathan Sheldon, *Unfair and Deceptive Acts and Practices* §§ 3.4.2.1 - 3.4.2.2, 193 (8th ed 2012) (explaining that the FTC and the Council of State Governments collaborated to develop a model law that had options for states to either adopt the general "deceptive practices" prohibition from federal law or the list of trade practices in the UDTPA).

1971 (UDTPA draft with commentary). Thus, the UDTPA materials with which legislators were presented in 1971 would not have given them any indication that, in enacting UTPA provisions which make no reference to "materiality," they were somehow implicitly incorporating that element from other sources of law.

Defendants contend that the UDTPA was nevertheless understood to require materiality. Defendants have not cited any case law to support that proposition, but, even if they had, we have previously said that interpretations of the UDTPA "are of limited value in discerning the legislative intent behind the [UTPA]" because the "policy underpinnings of [the UTPA] (protection of consumers) differ somewhat from the Uniform Act (protection of businesses)." *Denson*, 279 Or at 90 n 4.[10] Defendants also argue that the UDTPA provisions that correspond to paragraphs (1)(b) and (1)(e) have their origins in case law under the federal Lanham Trademark Act and the *Restatement (Second) of Torts* (Tent Draft No. 8, 1963), both of which, defendants contend, require materiality for representations to be actionable. Defendants have produced no evidence from the legislative history, however, and we are aware of none, to suggest that legislators were made aware of the content of those sources of authority.

At bottom, defendants' contention is that, although a requirement of materiality is not found in the text of paragraphs (1)(b) and (1)(e), in the corresponding provisions of the UDTPA, or in the commentary to the UDTPA that the legislature considered, we should infer that the legislature implicitly intended to incorporate that requirement from other sources of law that legislators did not discuss. That argument falls far short of what would be necessary to overcome the seemingly unambiguous text of paragraphs (1)(b) and (1)(e).

---

[10] Additionally, the UTPA does not include any express instruction from the legislature to apply and construe the UTPA in a way that promotes uniformity with the uniform law. *See* ORS 646.605 - 646.656. When the legislature intends to maintain a uniform interpretation, it can say so. *E.g.*, ORS 646.475(1) (stating that the Uniform Trade Secrets Act "shall be applied and construed * * * to make uniform the law * * * among states enacting [the act]"). The absence of such an instruction makes it even more difficult for legislative history to overcome the evident meaning of the text in context.

We briefly address defendants' reliance on maxims of statutory construction. Defendants argue, as the Court of Appeals also concluded, that the canon of constitutional avoidance counsels in favor of construing the statute to include a materiality requirement. Defendants also raise an "absurd results" argument. However, when the text, context, and legislative history provide a single unambiguous interpretation of the statute, we do not reach such maxims. *Coos Waterkeeper v. Port of Coos Bay*, 363 Or 354, 371-72, 423 P3d 60 (2018). In this case, the text, context, and legislative history demonstrate that the statute unambiguously does not require proof that a defendant's conduct was "material to consumer purchasing decisions."

### III.   CONSTITUTIONALITY

Having concluded that ORS 646.608(1)(b) and (1)(e) do not contain a specific materiality requirement, we next address defendants' argument that, without such a requirement, those paragraphs violate the free speech provisions of the Oregon and federal constitutions, either facially or as applied to defendants' conduct.

A.   *Article I, Section 8, of the Oregon Constitution*

The Oregon Constitution provides, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." Or Const, Art I, § 8.

1.   *The* Robertson *Framework*

Our analytical framework for evaluating a law's constitutionality under Article I, section 8, was established in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982). We have summarized that framework as follows:

"[U]nder the first category of the *Robertson* framework, a law that is 'written in terms directed to the substance of any "opinion" or any "subject" of communication' is unconstitutional unless the restriction is wholly confined within an historical exception. If the law passes that test but 'is directed in terms against the pursuit of a forbidden effect' and 'the proscribed means [of causing that effect] include speech or writing,' then the law falls into the second

category of *Robertson* and is examined for overbreadth. If a law is 'directed only against causing the forbidden effects,' it falls into the third category of *Robertson*. A law that falls into the third category can be challenged by arguing that the law 'could not constitutionally be applied to [a person's] particular words or other expression.'"

*State v. Babson*, 355 Or 383, 393-94, 326 P3d 559 (2014) (internal citations omitted).

A "category one" law, which by its terms prohibits speech based on its substance, is unconstitutional unless it falls "wholly" within a historical exception such as perjury or fraud. The historical exceptions can be extended "to contemporary circumstances or sensibilities." *Robertson*, 293 Or at 433-34 ("If it was unlawful to defraud people by crude face-to-face lies, for instance, free speech allows the legislature some leeway to extend the fraud principle to sophisticated lies communicated by contemporary means.").

A "category two" law is one that, "by [its] terms, purport[s] to proscribe speech or writing as a means to avoid a forbidden *effect*." *State v. Illig-Renn*, 341 Or 228, 235, 142 P3d 62 (2006) (emphasis added); *see also Robertson*, 293 Or at 415 (explaining that the coercion statute, which included the element of "mak[ing] a demand upon another person," was "directed in terms against the pursuit of a forbidden effect" and that the statute falls in category two because "speech is a statutory element in the definition of the offense"); *State v. Moyle*, 299 Or 691, 701-02, 705 P2d 740 (1985) (holding that a harassment statute, which prohibited "subject[ing] another to alarm by conveying a telephonic or written threat," was a category two law because verbal threats were an express element of the crime).

If a law falls in category two, then we analyze it for overbreadth. *State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992). A category two law is unconstitutionally overbroad if it "more than rarely" reaches protected expression and is not susceptible to a narrowing construction." *State v. Rangel*, 328 Or 294, 300, 977 P2d 379 (1999) ("A 'law is overbroad to the extent that it announces a prohibition that reaches conduct which may not be prohibited.'" (Quoting *Robertson*, 293 Or at 410.)); *Illig-Renn*, 341 Or at 232 ("[A] statute that

proscribes protected conduct only at its margins remains valid.").

"Category three" laws, on the other hand, prohibit forbidden results without referring to expression. *Plowman*, 314 Or at 164-65 (holding that a bias crime statute, prohibiting two or more persons from acting together based on their perception of the victim's race, color, religion, national origin, or sexual orientation to cause physical injury to the victim, is a category three law because the crime can be committed "without speaking a word" and without holding an opinion other than the perception of the victim's characteristics). Category three laws may be challenged only "as applied." *Id.* at 164.

Defendants argue that both ORS 646.608(1)(b) and (1)(e), without an implied element of materiality, violate Article I, section 8, either facially or as applied to defendants' conduct. As explained below, we reject defendants' facial challenges, and we decline to address their as-applied arguments in this posture.

2.   *ORS 646.608(1)(e)*

Paragraph (1)(e) provides that a person engages in an unlawful practice if the person

> "[r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

Defendants argue that ORS 646.608(1)(e) is a category one law because it "expressly prohibits speech" about the attributes that goods have. The state agrees that paragraph (1)(e) is a direct restriction of speech that is properly analyzed under *Robertson* category one. However, the state argues that the statute is constitutional because it falls within the historical exception for fraud.

We agree that paragraph (1)(e) is a category one law because, by its terms, it prohibits speech based on its substance. The statute makes it unlawful to "represent" that a product has attributes that the product does not have. And

the UTPA defines a "representation" in terms of communication: "any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2). Whether the representation violates paragraph (1)(e) turns on the substance of the representation itself rather than on any resulting effect: False representations violate the statute, while true representations do not. Thus, ORS 646.608(1)(e) prohibits expression based on its substance.

Category one laws are unconstitutional under Article I, section 8, unless they fall within a historical exception. To be within a historical exception, "the scope of the restraint [must be] wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Robertson*, 293 Or at 412. Examples of such exceptions are perjury, solicitation, forgery, extortion, and fraud. *Id.*

The state argues that ORS 646.608(1)(e) is permissible under Article I, section 8, because the framers of Oregon's constitution would not have understood the protection for free expression to reach deceptive representations about the attributes of goods, services, or real estate. In other words, the statute falls within the historical exception for fraud. Defendants argue that the fraud exception is inapplicable because paragraph (1)(e) can be violated without any showing of materiality or that a misrepresentation was made with knowledge of its falsity or an intent to mislead, as is required for common-law fraud.[11]

The concept of fraud was "well established" when Oregon's free expression guarantee was adopted. *See Robertson*, 293 Or at 433-34; *see, e.g.*, Or Laws 1854, ch 4, § 30 (criminalizing the act of obtaining money, goods, or merchandise by false pretenses with intent to defraud); General Laws of Oregon, Crim Code, ch III, § 565, p 415 (Deady & Lane 1843-72) (providing for imprisonment and

---

[11] A claim for fraud requires a plaintiff to prove falsity, materiality, knowledge of falsity, intent to deceive, and reliance, in addition to the representation, injury, and causation elements. *Discount Fabrics*, 289 Or at 384-85 (comparing the elements of common-law fraud to the UTPA).

civil damages for anyone convicted of "gross fraud or cheat at common law").

This court has also held that, in determining whether a historical exception applies, an exact match is not required between a contemporary restriction on speech and the analogous restriction that would have been recognized in 1859. *See Robertson*, 293 Or at 433-34 ("Constitutional interpretation of broad clauses locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the initial principle."). Thus, not every element of common-law fraud must be present for a contemporary law to fall within the historical exception for fraud. Rather, the exception applies if the law falls within "the spirit of Article I, section 8," by "remain[ing] true to the initial principle." *State v. Ciancanelli*, 339 Or 282, 318, 121 P3d 613 (2005).

Defendants are correct that paragraph (1)(e) does not require a showing of culpability—it does not require an intent to deceive, nor does it require knowledge of the falsity of a representation. However, this court has already concluded that those elements of the common-law tort are not required to bring a law within the historical fraud exception. In *Vannatta v. Keisling*, 324 Or 514, 931 P2d 770 (1997), *overruled on other grounds*, *Multnomah County v. Mehrwein*, 366 Or 295, 462 P3d 706 (2020), we considered whether a statutory provision that penalized a candidate for violating a pledge to abide by campaign expenditure limits violated Article I, section 8. *Id.* at 543-44. We explained that election laws that are "targeted at fraud" fit within the constitutional exception. *Id.* at 544. The fact that the statute at issue did not track all the elements of the common-law tort—*e.g.*, it did not require a culpable mental state—did not prevent this court from concluding that the statute was constitutional, because the statute was permissibly aimed at "misleading conduct." *See id.* at 544-45. On the contrary, we noted that "[t]he fact that a candidate may have intended to abide by expenditure limitations when he or she made the pledge, and only later decided to ignore that promise, does not make the failure to abide by the promise any less a fraud

on the voters who have relied on the candidate's Voters' Pamphlet statement to choose their candidate." *Id.* at 544 n 28. The possibility that some voters could have relied on a candidate's pledge was sufficient to apply the fraud exception, irrespective of the candidate's mental state. *See also State v. Moyer*, 348 Or 220, 234-38, 230 P3d 7 (2010) (citing *Vannatta* for the rule that "a statute that prohibits fraud on the electorate need not include an intent element to come within a historical exception").

Thus, although defendants assert that the historical understanding of fraud "punishes only culpable speech," this court has already recognized that the historical understanding was more expansive, at least for misrepresentations thought to affect the public interest. Our opinion in *Moyer* discussed the historical recognition of "misrepresentations that contribute[] to 'public inconvenience.'" 348 Or at 234 (citing William Blackstone, 4 *Commentaries on the Laws of England* 41-42 (1769)). We noted that "providing false identifying information to *** public bodies" would have been recognized as such an actionable misrepresentation, *id.*, and concluded that it was unlikely that the framers of Oregon's constitution intended "false communication in connection with public records and matters of legitimate governmental concern to be protected by Article I, section 8's guarantee of the free expression of opinion." *Id.* at 236. In reaching that conclusion, we expressly rejected the defendants' argument that an intent to deceive was required. *Id.* at 237 (citing *Vannatta*, 324 Or at 544 n 28).[12]

---

[12] Contemporaneous dictionaries also distinguished between forms of fraud based in part on whether a person had acted with scienter. *Bouvier's Law Dictionary* 546-47 (1860) distinguished between forms of fraud as follows:

"An *actual* or *positive fraud* is the intentional and successful employment of any cunning, deception, or artifice, used to circumvent, cheat, or deceive another.

"By *constructive fraud* is meant such a contract or act, which, though not originating in any actual evil design or contrivance to perpetrate a positive fraud or injury upon other persons, yet, by its tendency to deceive or mislead them, or to violate private or public confidence, or to impair or injure the public interests, is deemed equally reprehensible with positive fraud, and therefore, is prohibited by law, as within the same reason and mischief as contracts and acts done *malo animo*."

(Italics in original.)

Though it did not address the fraud exception, our decision in *Ciancanelli* provides further support for the conclusion that the framers of Article I, section 8, would not have expected it to protect false representations of the sort described in ORS 646.608(1)(e). In *Ciancanelli*, we explained that, "among the various historical crimes that are 'written in terms' directed at speech, those whose *real* focus is on some underlying harm or offense may survive the adoption of Article I, section 8, while those that focus on protecting the hearer from the message do not." 339 Or at 317 (emphasis in original); *id.* at 318 (explaining that framers were more likely to accept restrictions on speech that "have at their core the accomplishment or present danger of some underlying actual harm to an individual or group, above and beyond any supposed harm that the message itself might be presumed to cause to the hearer or to society"). Thus, where the direct prohibition on speech exists to prevent a non-speech harm, such as fraud, the conflict between that objective and the fundamental free-speech principle enshrined in Article I, section 8, is less stark than where the legislature acts to restrict speech based on a perceived harm inherent in the speech itself.

That understanding further persuades us that paragraph (1)(e) falls within the historical exception for fraud. Although paragraph (1)(e) is written in terms directed to the substance of speech, it is plain that the provision, like others in the UTPA, is aimed not at shielding people from supposedly detrimental messages or ideas themselves—an objective that would be anathema to Article I, section 8—but at the goal of protecting people from the *economic* harm that, in the legislature's judgment, arises from deceptive conduct in the market for goods, services, and real estate. That principle was familiar to the common law, as evidenced by, among other things, the law of trademarks. *See Amoskeag Manufacturing Company v. Spear*, 2 Sand Ch 599, 605-06 (NY Ch 1849) (explaining the "nature of the wrong" of trademark infringement as a combination of deceiving the public and diverting profits from another business); *Avery & Sons v. Meikle & Co.*, 81 Ky 73, 87 (1883) (describing the harm caused by deceiving consumers by copying the appearance of the plaintiff's goods as including "the inculcation of truth and honor in the

conduct of trade and commerce"); *see also Restatement (Third) of Unfair Competition* § 2 comment b (1995) (explaining the historical development of common law aimed at preventing economic harm caused by deceptive marketing).

In short, ORS 646.608(1)(e) is a restriction on speech that serves a purpose—avoidance of economic harm based on deceptive commercial practices—that was recognized when Article I, section 8, was drafted and is consistent with how the framers would have conceived of fraud. The statute has "at [its] core" the prevention of an "underlying actual harm to an individual or group, above and beyond any supposed harm that the message itself might be presumed to cause to the hearer or to society," *Ciancanelli*, 339 Or at 318, which makes it unlikely that the framers would have viewed it as incompatible with the free speech guarantee that they enshrined in the constitution. Accordingly, we conclude that paragraph (1)(e)'s prohibition on false representations about the "sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities" of a good, service, or real estate, made in the course of business, is not facially unconstitutional.

3.  *ORS 646.608(1)(b)*

Paragraph (1)(b) provides that a person engages in an unlawful trade practice if the person "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services." ORS 646.608(1)(b). Defendants argue that that provision is unconstitutional either because it is a *Robertson* category one law that does not fall within a historical exception, or because it is a *Robertson* category two law that is overbroad. The state argues that paragraph (1)(b) is a *Robertson* category three law that is not subject to a facial challenge; alternatively, the state argues that the provision is a category two law that is reviewed for overbreadth, and that the statute is not overbroad. For the reasons that follow, we agree with the state that paragraph (1)(b) is a category three law.

On its face, paragraph (1)(b) does not regulate speech. Rather, the statute prohibits a result—"caus[ing]

a likelihood of confusion or of misunderstanding." By its terms, the statute neither prohibits expression based on its substance (category one) nor identifies expression as a proscribed means of producing the specified result (category two). If paragraph (1)(b) is properly understood not to directly regulate speech at all, then it is not susceptible to a facial challenge; rather, a person who contends that the statute has been applied in a manner that unconstitutionally burdens protected expression is limited to bringing an as-applied challenge. *Illig-Renn*, 341 Or at 232.

Defendants argue that, although ORS 646.608(1)(b) is not expressly written in terms directed at speech, it must nevertheless be evaluated under *Robertson* category one or category two as an example of a "creatively worded" law that can only be violated through expression. Defendants' argument has its roots in several of this court's cases but ultimately fails.

As discussed earlier in this opinion, the fundamental difference between *Robertson* categories one and two, on the one hand, and category three, on the other, is that a category three law is not written in terms directed to expression at all. The general rule of *Robertson* is that, to trigger scrutiny under categories one or two, a law must *expressly* prohibit expression based on its substance or as a means of producing a targeted result—that is, expression must be a "statutory element." *Illig-Renn*, 341 Or at 235 (reiterating that we have limited facial overbreadth challenges to statutes that "more or less expressly identify protected speech as a statutory element of the offenses that they define"). The critical distinction is that "between making speech the crime itself, or an element of the crime, and using speech to *prove* the crime. *** [A] defendant who makes a facial challenge to a statute under Article I, section 8, must demonstrate the former—that the legislature intended to punish the speech itself." *Plowman*, 314 Or at 167 (emphasis added).

This court has, however, observed a theoretical exception to the rule that expression must be an "element" of the law to allow for a facial challenge. That exception recognizes the possibility that laws can be creatively drafted to avoid prohibiting speech as such, while making it

nonetheless clear that objectionable speech is the focus of the law. We first addressed that possibility in *Moyle*, in which we explained that "[t]he constitutional prohibition against laws restraining speech or writing cannot be evaded simply by phrasing statutes so as to prohibit 'causing another person to see' or 'to hear' whatever the lawmakers wish to suppress." *Moyle*, 299 Or at 699. We noted that, in principle, the legislature has plenary power to protect persons from whatever conduct the legislature regards as harmful, subject to constitutional limits. "A difficulty arises, however, when a statute defines a crime in terms of causing a kind of harm which necessarily results only from speech or writing, so that the statutory definition is only the other side of the coin of a prohibition of the speech or writing itself." *Id.*

We proceeded to explain that the statute in that case was *not* such a law. In *Moyle*, the statute prohibited harassment, "defined as alarming another person by conveying a telephonic or written threat to inflict serious physical injury or commit a felony." *Id.* at 693. This court held that the effect described—causing fear of injury to persons or property—did not "merely mirror[] a prohibition of words themselves" because it could be caused by means other than expression. *Id.* at 701. Thus, the statute was not a *Robertson* category one law. However, because the statute expressly addressed the use of words to *cause* the forbidden effect, it required scrutiny for overbreadth (category two).

Similarly, in *Illig-Renn*, we considered the constitutionality of the then-extant version of ORS 162.247(1)(b), which made it a crime to "refuse[] to obey a lawful order by [a] peace officer," and held that the statute was not subject to a facial challenge. 341 Or at 230. We reiterated that,

> "in the context of challenges under Article I, section 8, of the Oregon Constitution, this court has limited facial overbreadth analysis to statutes that more or less expressly identify protected speech as a statutory element of the offenses that they define, or that otherwise proscribe constitutionally protected speech 'in [their] own terms.' And, more to the point, we have stated specifically that, when a statute does *not* refer to protected speech 'in terms,' it is not an appropriate subject for overbreadth analysis and may only be challenged 'as applied.'

"The foregoing does not mean that we will ignore a clear case of facial unconstitutionality or overbreadth merely because the statute manages to avoid any direct reference to speech or expression. As this court acknowledged in [*Moyle*], '[t]he constitutional prohibition against laws restraining speech or writing cannot be evaded simply by phrasing statutes so as to prohibit "causing another person to see" or "to hear" whatever [speech or expression] the lawmakers wish to suppress.' But, in general, we will not consider a facial challenge to a statute on overbreadth grounds if the statute's application to protected speech is not traceable to the statute's express terms."

341 Or at 235-36 (emphasis in original; internal citations omitted). As to the statute challenged in that case, this court rejected the defendant's argument that the statute expressly restrains expression because the refusal to obey a police officer's order "conveys a message of opposition or dissent whether by verbal means or an expressive act." We reasoned that the statute is concerned with the "act" of refusing to obey an order, and the fact that such an act might also be intended to convey a message was not relevant. *Id.* at 237. In short, we applied the general rule that where a statute is not expressly aimed at restricting speech, analysis for facial overbreadth was inappropriate, irrespective of the statute's foreseeable effect on expression.

Our most recent discussion of these issues was in *Babson*. In that case, the defendants argued that a legislative rule regulating the use of the steps of the state Capitol between 11 p.m. and 7 a.m. required analysis under *Robertson* category two because it had an "'obvious and foreseeable' application to speech"—*i.e.*, it would prevent the defendants from staging an around-the-clock political protest. 355 Or at 398. This court rejected that argument. In doing so, we explained:

"When expression is a proscribed means of causing the harm prohibited in a statute, it is apparent that the law will restrict expression in some way because expression is an element of the law. For that type of law, the legislature must narrow the law to eliminate apparent applications to *protected* expression. However, if expression is not a proscribed means of causing harm, and is not described in the terms of the statute, the possible or plausible application of

the statute to protected expression is less apparent. That is, in the former situation, every time the statute is enforced, expression will be implicated, leading to the possibility that the law will be considered overbroad; in the latter situation, the statute may never be enforced in a way that implicates expression, even if it is possible, or even apparent, that it *could* be applied to reach protected expression. When a law does not expressly or obviously refer to expression, the legislature is not required to consider all apparent applications of that law to protected expression and narrow the law to eliminate them."

*Id.* at 400 (emphasis in original; internal citations omitted). We then discussed our previous holdings in *Moyle* and *Illig-Renn* and reaffirmed that, as a general rule, to warrant review for facial overbreadth, a law must expressly restrain speech; a statute that does not directly refer to speech is not subject to overbreadth analysis, even though it may have "obvious" applications to speech. The legislative rule in *Babson* did not expressly restrict speech, nor was it "simply a mirror of a prohibition on words," 355 Or at 403, of the sort that *Moyle* and *Illig-Renn* cautioned would still subject a statute to a facial challenge.

In sum, this court in *Moyle*, *Illig-Renn*, and *Babson* has described a theoretical category of laws that do not expressly restrict speech but that, nonetheless, are appropriately reviewed for facial overbreadth because they are functionally indistinguishable from such express restrictions—they "mirror" a prohibition on the words themselves. As we noted in *Moyle*, a law that makes it unlawful to cause someone to "see" or "hear" something is nothing but an alternative way of prohibiting expression. We refer to that category as "theoretical" because this court has not yet decided a case in which a law was held to fall within it. Rather, as the foregoing cases illustrate, even laws that have obviously foreseeable applications to speech are not properly viewed as facial restrictions *of* speech without an indication that "the legislature intended to punish the speech itself." *Plowman*, 314 Or at 167.

With that background, we return to ORS 646.608 (1)(b). The statute prohibits a person, in the course of the person's business, from "caus[ing] a likelihood of confusion or of

misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services." Unlike many of the other prohibitions that immediately follow it in the UTPA, which use terms such as "represent," "solicit," "disparage," and "advertise" to describe what a person may not do, paragraph (1)(b) is written without any reference to communication. It may be, of course, that speech is the means through which the forbidden result—the causation of a likelihood of confusion—will often come about. It may even be said that paragraph (1)(b) has obvious and foreseeable applications to speech. But that was also true of the laws in *Moyle*, *Illig-Renn*, and *Babson.* Here, the text and context suggest that, far from desiring to "punish the speech itself," *Plowman*, 314 Or at 167, the legislature was indifferent as to whether the likelihood of confusion is brought about by speech or by some other, nonexpressive means. The fact that paragraph (1)(b) does not mention expression, while so many other prohibitions in subsection (1) do, tends to suggest that, when it came to paragraph (1)(b), the legislature contemplated that speech is *not* the only means by which a likelihood of confusion might be created, and that the legislature intended to forbid that result whether caused by speech or not. Thus, paragraph (1)(b) is not the sort of "mirror of a prohibition on words" that we have said would trigger overbreadth analysis.

In arguing to the contrary, defendants contend that paragraph (1)(b) can only be violated through speech. Even assuming that that premise would justify analysis under *Robertson* categories one or two,[13] we are not persuaded by defendants' bare assertion that "expressive communication is the only way that a person could cause confusion as to goods' approval or certification." Although this court has previously recognized that "selling is a form of communicative behavior," that statement came in a case that involved door-to-door solicitation. *City of Hillsboro v. Purcell*, 306 Or 547, 555, 761 P2d 510 (1988). We have never held that all conduct

---

[13] As noted above, this court has held that a statute that *is written* to "mirror" a prohibition of words should be treated as an express restriction on speech. That is not the same thing as saying that a law should be viewed as a restriction on speech just because all or most of its foreseeable applications are to speech. As we said in *Plowman*, there must be an indication that the legislature intended to punish the "speech itself." 314 Or at 167.

associated with the sale of goods and services is expressive. Here, the statute could reach such things as the manner in which products are packaged, the location at which they are sold, or even where they are placed on a store shelf, if a likelihood of confusion or misunderstanding were likely to result. Suppose, for example, a person sets up a sales booth at a location where the public could infer, based on signage created by other sellers, that *all* products being sold at that location share common "approval" or "certification." If the person's product lacks such approval or certification, a likelihood of confusion or misunderstanding could be created simply by the person's choice of location.

For the foregoing reasons, we conclude that ORS 646.608(1)(b) is a category three law under *Robertson* that is not subject to a facial challenge.

4.  *Defendants' remaining "as-applied" challenges*

Defendants alternatively argue that, if paragraphs (1)(b) and (1)(e) are not unconstitutional on their face, they are unconstitutional as applied to defendants' conduct. Neither party has presented well-developed arguments on that question, and we decline to reach it. As explained earlier in this opinion, the trial court found in defendants' favor on multiple grounds, which the state separately challenged on appeal. Having concluded that materiality is a required element of the statutory claims that the state did not prove, the Court of Appeals did not reach all of the state's assignments of error. Thus, our conclusion today that materiality is not a required element does not mean that the state will ultimately prevail on any of its claims. The Court of Appeals on remand will have the opportunity to consider the other bases for the trial court's judgment in defendants' favor (including its conclusions regarding the legal standard for willfulness, the legal standard for false representation under paragraph (1)(e), and the legal standard for likelihood of confusion or misunderstanding under paragraph (1)(b)). Depending on the resolution of those issues, the trial court judgment could be affirmed on other grounds, which would render it unnecessary to consider defendants' argument that paragraphs (1)(b) and (1)(e), as applied to their conduct, violate Article I,

section 8, of the Oregon Constitution. Accordingly, it is premature for this court to consider that issue.

B.   *The First Amendment to the United States Constitution*

We now turn to defendants' argument that, without a requirement of materiality, paragraphs (1)(b) and (1)(e) violate the First Amendment to the United States Constitution.

Under the First Amendment, states may regulate false or deceptive commercial speech. *Friedman v. Rogers*, 440 US 1, 10 n 9, 99 S Ct 887, 59 L Ed 2d 100, *reh'g den*, 441 US 917 (1979) ("By definition, commercial speech is linked inextricably to commercial activity: while the First Amendment affords such speech 'a limited measure of protection,' it is also true that 'the [s]tate does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.'"). The Supreme Court has held that commercial speech receives "a different degree of protection" than other types of speech. *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 US 748, 771 n 24, 96 S Ct 1817, 48 L Ed 2d 346 (1976). It has explained that commercial speech is more objective and verifiable than other types of speech, and that commercial speech is less at risk of being "inhibited by proper regulation." *Friedman*, 440 US at 10.

The test for determining whether a regulation of commercial speech violates the First Amendment comes from *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 US 557, 566, 100 S Ct 2343, 65 L Ed 2d 341 (1980). That four-part test first examines whether the speech at issue is protected by the First Amendment: that is, whether it concerns lawful activity and is not misleading. If, under that prong, the speech concerns unlawful activity or is "more likely to deceive the public than to inform it," the government can prohibit it as unprotected speech. *Id.* at 563. However, if the communication concerns lawful activity and is not misleading, "the government's power is more circumscribed." *Id.* at 564. In that scenario, the speech is protected, and we analyze the other three steps: whether the government has a substantial interest, whether the regulation directly

advances that interest, and whether the regulation is not more extensive than necessary to serve that interest. *Id*.

The regulations at issue affect speech that "[c]auses likelihood of confusion or of misunderstanding" and "representations" that a product has certain characteristics that it does not have. Because ORS 646.608(1)(b) and (1)(e) concern misleading commercial speech, they are permissible under *Central Hudson*.

## IV.   CONCLUSION

From the text, context, and legislative history, we conclude that violation of ORS 646.608(1)(b) and (1)(e) may be established without proof that a defendant's conduct was material to consumer purchasing decisions. We further conclude that neither provision is facially unconstitutional.[14]

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

---

[14] In light of our decision, it is unnecessary to reach the parties' arguments concerning attorney fees and the AVC. Resolution of those issues will depend on how the merits are resolved on remand.