30 September 18, 2024 No. 655

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE ex rel Ellen F. ROSENBLUM,
in her official capacity as Attorney General
for the State of Oregon,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

LIVING ESSENTIALS, LLC,
a Michigan limited liability company; and
Innovation Ventures, LLC,
a Michigan limited liability company,
*Defendants-Respondents*
*Cross-Appellants.*

Multnomah County Circuit Court
14CV09149; A163980

On remand from the Oregon Supreme Court, *State ex rel Rosenblum v. Living Essentials*, 371 Or 23, 529 P3d 939 (2023).

Kelly Skye, Judge.

Submitted remand June 15, 2023.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the briefs for appellant-cross-respondent.

Lori Irish Bauman, Nena Cook, and Ater Wynne LLP; and Joel A. Mullin and Stoel Rives LLP filed the combined answering and cross-opening brief. Michael J. Sandmire, Nena Cook, and Ater Wynne LLP; and Joel A. Mullin and Stoel Rives LLP filed the reply brief on cross-appeal. Michael J. Sandmire and Buchalter; and Rachel Lee and Stoel Rives LLP filed the supplemental briefs for respondents-cross-appellants.

Trenton H. Norris, Raqiyyah R. Pippins, Said O. Saba, Jr., and Arnold & Porter Kaye Scholer LLP; and R. Daniel

Lindahl and Bullivant Houser Bailey PC filed the brief *amici curiae* for Counsel for Responsible Nutrition.

Before Aoyagi, Presiding Judge, Lagesen, Chief Judge, and DeVore, Senior Judge.

LAGESEN, C. J.

On appeal, general judgment reversed and remanded as to Count 1, otherwise affirmed; on cross-appeal, supplemental judgment reversed and remanded.

**LAGESEN, C. J.**

This case is on remand to us from the Supreme Court. It arises under the Unlawful Trade Practices Act (UTPA), ORS 646.605 to ORS 646.656. *See State ex rel Rosenblum v. Living Essentials*, *LLC*, 371 Or 23, 529 P3d 939 (2023) (*Living Essentials II*); *State ex rel Rosenblum v. Living Essentials*, *LLC*, 313 Or App 176, 497 P3d 730 (2021) (*Living Essentials I*). For the reasons that follow, we reverse and remand the general judgment entered in favor of defendants as to Count 1 for the trial court to determine whether defendants made misrepresentations that violated ORS 646.608(1)(e) and, if so, what remedial measures are warranted. We otherwise affirm the general judgment. We adhere to our prior decision to reverse and remand the supplemental judgment denying defendants' petition for attorney fees. In the event that defendants prevail on remand, the trial court should reconsider that request.

## I. OVERVIEW

The previous decisions in this case set forth the facts, so we do not repeat them in full. We recount the procedural history of the case to identify the questions that are before us on remand. We then provide a brief overview of our resolution of those questions, before supplying our analysis of them.

At issue is the veracity of claims defendants have made in advertising their product, 5-hour ENERGY® (5-HE). The state contends that defendants have made numerous false, misleading, and confusing statements in violation of ORS 646.608(1)(b) and (1)(e). It seeks a range of remedies—both retrospective, in the form of civil penalties, and prospective, in the form of injunctive relief—for that alleged conduct. Following a bench trial, the trial court found in favor of defendants on all alleged violations and entered a general judgment in favor of defendants. The trial court later denied defendants' petition for attorney fees and entered a supplemental judgment on the denial. The state appealed the general judgment, and defendants cross-appealed the supplemental judgment. We affirmed the general judgment and reversed and remanded the supplemental judgment. *Living Essentials I*, 313 Or App at 178.

With respect to the general judgment, we agreed with the trial court that the UTPA required the state to prove that defendants' statements at issue were "material to consumer purchasing decisions" and that the state failed to do so. *Living Essentials I*, 313 Or App at 194, 196-97. As a result of that conclusion, we did not reach defendants' argument that, absent a materiality element, ORS 646.608(1)(b) and (1)(e) would be facially invalid under Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution. *Id*. at 178 n 1. In addition, with respect to Count 3 of the complaint, which was predicated on alleged misrepresentations about the decaffeinated 5-HE, we rejected the state's argument that the trial court's findings meant that the state was entitled to entry of judgment in its favor on those counts. *Id*. at 197-204. As to attorney fees, we disagreed with the trial court's conclusion that defendants' assurance of voluntary compliance was unsatisfactory under ORS 646.632 and remanded for the trial court to determine, in its discretion, whether and what amount of attorney fees to award. *Id*. at 218-19. Given those conclusions, we also did not reach the state's appellate challenges to additional, alternative bases on which the trial court had ruled in favor of defendants. *Id*. at 197.

The state petitioned for review, challenging our conclusion that ORS 646.608(1)(b) and (1)(e) required proof that false, misleading, or confusing representations were material to consumer purchasing decisions; the state did not seek review of our ruling with respect to decaffeinated 5-HE on Count 3. The Supreme Court allowed review and reversed. The court concluded that the UTPA did not impose a requirement that the state prove that the statements at issue were "material to consumer purchasing decisions." *Living Essentials II*, 371 Or at 44. The court then addressed defendants' argument that the lack of a materiality requirement rendered the UTPA facially unconstitutional under Article I, section 8, and the First Amendment. The court concluded that the UTPA, as the court had construed it, was not facially unconstitutional. *Id*. at 46-57. The court withheld judgment on any "as-applied" analysis, noting that resolution of the issues on remand may render it unnecessary to consider the as-applied concerns. *Id*. at 57-58. For similar

reasons, the court did not reach the issue of attorney fees. *Id*. at 59 n 14. The court remanded to us to identify and address the issues that remain as a result of its decision. *Id*. at 59.

On remand, the parties submitted supplemental briefs that have helpfully identified the issues that remain for us to resolve on remand. As to the state's appeal, those issues are (1) whether, as to the first and second assignments of error which challenged whether ORS 646.608(1)(b) and (1)(e) contained a materiality element, a remand is required on Counts 1, 4, and 6; (2) whether, as to the third assignment of error, the trial court erred in concluding certain representations by defendant about the effects of consuming 5-HE were nonactionable puffery; (3) whether, as to the fifth assignment of error, the trial court applied an incorrect standard of willfulness in rejecting the state's claim for civil penalties on Count 1; (4) whether, as to the sixth assignment of error, the trial court applied an erroneous legal standard when it found that the challenged representations made by defendants were not misrepresentations; and (5) whether, with respect to the seventh assignment of error, the trial court applied an erroneous legal standard in finding that the challenged statements by defendants did not cause a likelihood of confusion. In addition, the state argues that, in view of the Supreme Court's conclusion that the UTPA does not contain a materiality requirement, we should reconsider our resolution of the cross-appeal related to attorney fees and, in particular, should conclude that defendants' assurance of voluntary compliance was inadequate.

Ultimately, as to the first issue identified above, we conclude that a remand on Count 1 is necessary as a result of the Supreme Court's decision but that a remand is not required with respect to Counts 4 and 6 for reasons we will explain. On the second, issue, we conclude that the trial court erroneously concluded that certain statements by defendants were nonactionable puffery and remand for the court to determine whether those particular statements are false. We reject the remainder of the state's claims of error.

Our conclusion that a remand is required on Count 1 means that we must address defendants' first, third,

and fourth cross-assignments of error. In their first cross-assignment of error, defendants argue that the trial court erred when it did not require the state to prove "by a preponderance of the evidence that all reasonable experts in the field agree that the representations are false" in order to demonstrate falsity. We reject that argument as unfounded in the text of the UTPA or Oregon case law. In their third and fourth assignments of errors, defendants raise contingent as-applied challenges, under Article I, section 8, and the First Amendment, to the application of ORS 646.608(1)(b) and (e) to their conduct, arguing that "[i]f this Court finds error in the Verdict on any grounds advanced by the State, then the judgment must be affirmed on the grounds that ORS 646.608(1)(b) and (e) are unconstitutional as applied." We reject those challenges as inadequately developed and premature for our review.

Finally, as to the cross-appeal, we adhere to our prior decision and reverse and remand the supplemental judgment denying fees so that the trial court can reconsider the issue under the proper legal standard if defendants again prevail on remand.

## II.   ANALYSIS

A.   *First Assignment of Error: Whether the Supreme Court's Determination that ORS 646.608(1)(e) Does Not Have a Materiality Element Requires a Remand on Counts 1 and 4*

We start with the first assignment of error. In that assignment of error, the state asserted that the trial court erred in ruling for defendants on Counts 1 and 4 when it determined that ORS 646.608(1)(e) required the state to demonstrate that the alleged misrepresentations regarding the noncaffeine ingredients (NCI) in 5-HE were material to consumer purchasing decisions. The Supreme Court concluded that the statute contained no such materiality requirement, and the remaining issue is whether that ruling requires a remand on either Count 1 or Count 4.

With respect to Count 1, the state argues that, as a result of the Supreme Court's rejection of a materiality element, we must remand for the trial court to address the

question it left unanswered before: whether defendants' representations are false by implication and, as a result, actionable. *See Rathgeber v. Hemenway*, 335 Or 404, 412, 69 P3d 710 (2003) ("An actionable representation under the UTPA may be express or implied.").

In response, defendants assert that the state failed to plead or preserve a theory that defendants made implied misrepresentations. Therefore, defendants argue, no remand is required as a result of the Supreme Court's ruling because, in their view, Count 1 is completely resolved by the trial court's (1) unchallenged ruling that none of defendants' advertisements were inherently false and (2) its ruling that some of the statements were nonactionable puffery, a ruling that defendants contend should be affirmed. In support of the argument, they point to our discussion of our resolution of the state's challenge to Count 3 in *Living Essentials I*. There, we explained that with respect to that count, which addressed defendants' representations regarding decaffeinated 5-HE, "the state's theory of liability in Count 3 was not that defendants falsely represented the duration of the effects from the NCI, but that the NCI have any effect on alertness or energy *at all*." *Living Essentials I*, 313 Or App 203 (emphasis in original; footnote omitted). We then upheld the trial court's verdict on Count 3 because we determined that the trial court had found that defendants' representations about the NCI in decaffeinated 5-HE were not false in the particular way alleged by the state on that count. *Id*. at 203-04. Defendants rely on that analysis to argue that we have already determined that the trial court found that defendants' representations about the NCI were not false in the particular manner alleged by the state.

Having reviewed the record, we agree with the state that a remand is required with respect to Count 1 as a result of the Supreme Court's decision. On the preservation point, contrary to defendants' arguments, the state's claims as pleaded, as well as its trial theory, were that defendants' advertisements made representations that, in context, were misleading about the properties of the NCI in Original and Extra-Strength 5-HE, to the extent that the representations created the impression that the NCI contributed "in any meaningful

way extra energy, alertness, or focus," beyond that provided by the caffeine. The state expressly argued that, under the UTPA, actionable misrepresentations can be expressed or implied. The trial court did not address the state's implication theory because it understood the misrepresentation test to contain a materiality requirement, making it unnecessary to address the misrepresentations-by-implication theory.

We also are not persuaded by defendants' argument that our previous analysis of the state's theory on Count 3 is dispositive on Count 1. For one, the trial court itself differentiated among the claims: "the truth or falsity of [d]efendants' advertising claims and whether they are actionable as related to B-vitamins and amino-acids depends specifically on how each claim is presented." Moreover, we do not view the state's theory of liability with respect to caffeinated 5-HE to be the same as its theory of liability with respect to decaffeinated 5-HE. The former focused on representations implying that NCI added anything to the experience produced by caffeine; the latter focused on whether the NCI had any effect on energy at all. Accordingly, we remand to the trial court to determine whether defendants' advertisements impliedly misrepresented the effects of the NCI in Original and Extra-Strength 5-HE, as alleged in Count 1 of the complaint, and for such further proceedings as may be warranted.

That leaves the issue of Count 4. In addition to finding that the state did not demonstrate materiality, the trial court found that the state failed to prove that the statements at issue in Count 4 were false. Because the verdict on Count 4 can be sustained on that basis, as we discuss more fully in addressing the state's sixth assignment of error, the Supreme Court's decision regarding materiality does not require a remand on Count 4.

B.  *Second Assignment of Error: Whether the Supreme Court's Determination that ORS 646.608(1)(b) Does Not Have a Materiality Element Requires a Remand on Count 6*

In the second assignment of error, as with the first, the state challenged the trial court's determination that, with respect to Count 6, the state was required to prove, but

failed to prove, that the allegedly misleading substantive message of defendants' "Ask Your Doctor" ads was material to consumer purchasing decisions. The Supreme Court determined that the trial court erred in that respect. *Living Essentials II*, 371 Or at 38. In addition to finding that the state did not demonstrate materiality, the trial court found that the state failed to prove that the statements at issue in Count 6 were false. Because the verdict on Count 6 can be sustained on that basis, as we discuss more fully in addressing the state's seventh assignment of error, the Supreme Court's decision regarding materiality does not require a remand on Count 6.

C.  *Third Assignment of Error: Whether the Trial Court Erred in Determining that Claims About Feelings Were Nonactionable Puffery*

In disposing of Count 1, the trial court ruled that one category of statements challenged by the state constituted nonactionable puffery:

> "Defendants' advertising claims that 5HE provides feelings of energy, alertness, and brightness or that it 'packs a punch' are subjective in nature, and such subjective measurements can only be undertaken by the consumer. Thus, I find that the following exhibits are non-actionable puffery under the UTPA: [list of exhibits]."

On appeal, the state argues that the trial court erred as a matter of law when it determined that defendants' "claim that NCI in a bottle of [5-HE] provide 'feelings' of energy and alertness" was nonactionable puffery. In particular, in its opening brief, the state asserts that the following statements are actionable:

- "Its blend of B-vitamins, amino acids and enzymes help you feel bright, alert, and focused." (Statement 1)

- "The blend of [B]-vitamins, amino acids, nutrients and caffeine in [5-HE] will give you the bright, alert feeling you need to really get into it." (Statement 2)

- "It's simple * * * caffeine with vitamins and nutrients. It's the combination that makes it great. * * * Disclaimers: Provides a feeling of alertness and energy. Does not provide caloric energy." (Statement 3)

- "It's packed with [B]-vitamins for energy and amino acids for alertness and focus. There is zero sugar, zero herbal stimulants, and only as much caffeine as a cup of premium coffee. The two-ounce energy shot takes just seconds to drink and in minutes you're feeling bright and alert. And that feeling lasts for hours." (Statement 4)

- "It contains a powerful blend of B-vitamins for a feeling of energy and alertness." (Statement 5)

- "[5-HE] contains a healthy, powerful blend of B-vitamins for energy, amino acids for focus and better mood, and enzymes to help you feel it fast." (Statement 6)

The state asks us to "remand [C]ount 1 for the trial court to assess whether defendants' representations about the 'feelings' of energy and alertness provided by a bottle of [5-HE] violate the UTPA."[1]

In response, defendants argue that the issue is one of fact and, further, that the evidence supports the trial court's findings that the statements were puffery. Defendants noted that the state itself argued in its opposition to summary judgment that its ORCP 47 E affidavit gave rise to a dispute of fact as to whether the statements were nonactionable puffery. Defendants argue that the trial court implicitly determined that the issue was one of fact and that the court's judgment must be upheld on appeal because there is some evidence to support it.

In reply, the state acknowledges that the trial court treated the issue of puffery as one of fact. It asserts that the issue of puffery can be a mixed question of law and fact but argues that, with respect to the statements about feelings, the question is one of law. It reiterates its position that, as a matter of law, defendants' representations about the "feelings" caused by the NCI are not puffery, requiring the trial court to make findings as to whether they are false representations.

---

[1] We understand the state's argument on appeal to contest the trial court's puffery determination only insofar as the court determined that representations about the "feelings" caused by the NCI in 5-HE were puffery. The state does not argue, for example, that the trial court erred to the extent that it concluded that representations about 5-HE "pack[ing] a punch" were nonactionable puffery.

For the reasons that follow, we conclude that the trial court erred when it concluded that all statements related to feelings were puffery. Some of the statements were not puffery as a matter of law, so we reverse and remand as to those statements for the trial court to assess whether they are false. As to the balance of the statements, the trial court correctly determined that the issue of puffery was one of fact and its factual findings that they are puffery are supported by the record.

As an initial matter, we address two procedural points. First, although the trial court ruled that a number of exhibits were nonactionable puffery, on appeal, the state identifies only six specific statements in its argument that the court erred in ruling that certain statements were puffery. For purposes of resolving this assignment of error, we consider only those statements identified by the state in its opening brief. It is not our role to scour the record on behalf of the state to identify any additional statements deemed by the trial court to be puffery and to then assess whether or not the ruling was erroneous with respect to the particular statement. *See Sharma v. Providence Health & Services-Oregon*, 289 Or App 644, 664, 412 P3d 202 (2018) (so noting).

Second, defendants' arguments appear to suggest that the state conceded that the issue of puffery was one of fact in this case, making the trial court's supported factual findings on the point dispositive of this appeal. We disagree. The state consistently took the position that defendants' representations about the feelings caused by the NCI were not puffery but, instead, were specific, objectively verifiable representations as a matter of law. Only in the alternative did the state argue that its ORCP 47 E affidavit created a dispute of fact as to whether the statements were puffery. At trial, the state advanced the same argument. Its primary contention was that the statements, as a matter of law, were not puffery and that the factual issue for the trial court to resolve was whether the representations were false. Its alternative argument was that, to the extent the trial court viewed the issue as one of fact, the court should find in the state's favor on that factual issue. Under those circumstances, we think the issue before us is whether any

of the identified statements deemed by the trial court to be puffery are, as matter of law, not puffery.

Having addressed those procedural points, the next question we must resolve is whether the issue of puffery is one of law, fact, or sometimes law and sometimes fact.

"The concept of puffery is as old as our legal system." *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 836 NW 2d 807, 815 (Wis 2013) (citing Stefan J. Padfield, *Is Puffery Material to Investors? Maybe We Should Ask Them*, 10 U PA J Bus & Emp L 339, 350-53 (2008)). It rests on the principle that certain representations made in the context of sales are ones that no reasonable buyer would take seriously, such that the law will not subject a seller to liability for making such statements. *Id.* at 815-16 (citing *Kimball v. Bangs*, 11 NE 113, 114 (Mass 1887) and *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F 853, 856 (2d Cir 1918)). Although the concept is ancient, no Oregon appellate decision addresses it. For that reason, we look to the decisions of other courts, of which there are many, for guidance on (1) whether the question is one of law or fact and (2) the appropriate legal standard. *See Allianz Global Risks v. ACE Property & Casualty Ins. Co.*, 367 Or 711, 740-41, 483 P3d 1124 (2021) (looking to case law from other jurisdictions in the absence of Oregon case law addressing the issue at hand).

Having canvassed the case law, the most helpful discussion of the law-vs.-fact question that we have located comes from the Wisconsin Supreme Court. Analyzing whether a statement could be deemed puffery on summary judgment, the court explained that, where there is more than one reasonable inference to be drawn "as will often be the case, it should go to the [factfinder]." *United Concrete*, 836 NW 2d at 818. But "[w]hen there is no reasonable interpretation that would evidence puffery, it wastes the taxpayers' and the parties' time and money, not to mention scant judicial resources, to assemble a jury and submit to it the question." *Id.* The court further explained that its approach was consistent with the decisions of other courts and that "[a] substantial majority of decisions resolving the puffery question do not purport to apply a blanket rule; they

simply determine, with reference to the specific facts and allegations \* \* \*, whether the question can be resolved as a matter of law by the court or instead requires consideration of the [factfinder]." *Id*. at 819-20.[2]

That approach appears to us to be consistent with the cases cited by the court to support its holding, as well as those cited to us by the parties, including *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F2d 242, 245-46 (9th Cir 1990), the Ninth Circuit case on which the state places the most weight. We find that approach persuasive and have not identified any principles of Oregon law with which it conflicts. Accordingly, we hold that the question of whether a statement is puffery is a question of fact, unless, as matter of law, all reasonable factfinders would have to reach the same conclusion as to whether the statement was or was not puffery.

Turning to the legal test for puffery, in the absence of any Oregon case law, we again look to the decisions of other courts for guidance. Although courts phrase it in different ways, they appear generally to be in accord as to the characteristics that make a statement puffery. In *Cook*, the case relied on by the state, the Ninth Circuit canvassed cases describing puffery, ultimately concluding that puffery involved general, exaggerated, or subjective statements on which reasonable consumers would not rely: "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions." 911 F2d at 246. The Connecticut Supreme Court identified a similar standard, stating that the key considerations are whether a statement "is unlikely to induce reliance and is insusceptible

---

[2] The court observed, in addition, that a "number of courts have refrained from drawing a bright line around puffery in terms of whether it presents a question of fact or of law, recognizing, as we do, that while it usually is a question of fact it can at times be a question of law, and that courts should apply the usual summary judgment standard to figure out which label fits more closely in a given case." *Id*. at 819 (citing Donald Braman et al., *Some Realism About Punishment Naturalism*, 77 U Chi L Rev 1531, 1571 n 146 (2010) ("Many of the issues in puffery \* \* \* are often resolved as matters of law rather than fact.")); *Snyder v. Farnam Cos.*, 792 F Supp 2d 712, 723 (D NJ 2011); *Redmac, Inc. v. Computerland of Peoria*, 489 NE 2d 380, 382 (Ill App Ct 1986); *Park Rise Homeowners Ass'n v. Resource Const. Co.*, 155 P3d 427, 435 (Colo App 2006); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F3d 1331, 1340 (10th Cir 2012)).

to being proved true or false." *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A3d 37, 55 (Conn 2020).

The Wisconsin Supreme Court's analysis is comparable. That court examined the history of puffery, observing that the doctrine arose to insulate sellers from liability for those types of exaggerated, subjective statements that are fair to expect merchants to make but that would not be reasonable for a buyer to take seriously. *United Concrete*, 836 NW 2d at 815-17 (quoting *Kimball*, 11 NE at 114 ("The law recognizes the fact that men will naturally overstate the value and qualities of the articles which they have to sell. All men know this, and a buyer has no right to rely upon such statements."); and *Vulcan Metals Co.*, 248 F at 856 (observing that there are "some kinds of talk which no man takes seriously, and if he does he suffers from his credulity")). The court then explained that it had adopted the "same essential principles" into its common law. *United Concrete*, 836 NW2d at 816. "In our state, a salesperson engages in puffery when he gives voice to the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." *Id*. (internal quotation marks omitted).

Drawing from those cases, and the cases cited in them, we conclude that a seller's statements constitute puffery if they are general or subjective, that is, insusceptible to being proven true or false, such that they are unlikely to induce consumer reliance. On the flip side, statements that are not puffery, and thus are actionable, are specific and objective, that is, susceptible to being proven true or false, such that they are likely to innduce consumer reliance.

We now apply those legal standards to the facts of this case. As noted, the trial court ruled that statements representing that 5-HE caused particular "feelings" or that it "packed a punch" were nonactionable puffery. It did so after concluding that the issue on this record was one of fact. Then, relying on the testimony of defendants' expert, Beales, the court found that the representations about the feelings caused by 5-HE were not objective representations and also were not likely to deceive consumers. Beales, who had worked at the Federal Trade Commission (FTC) evaluating

claims of deceptive advertising, explained that the FTC had issued a policy statement concluding that "certain kinds of claims are unlikely to mislead consumers acting reasonably under the circumstances and for that reason the commission will not generally pursue claims that involve subjective characteristics, such as taste, feeling, appearance and the like." The policy statement further concluded that "deception is particularly unlikely where there is an inexpensive, frequently purchased product" because "consumers can tell for themselves" how the product works and will not buy the product again if it does not work.

The question for us is whether the trial court legally erred in taking that approach. The state argues that it did, contending that we should conclude as a matter of law that the statements were not puffery. Defendants argue that the trial court permissibly concluded that the issue was one of fact and that the court's factual findings are supported by Beale's testimony, requiring us to affirm.

With respect to four of the statements listed above, we agree with defendants that (1) the trial court correctly determined that the issue of puffery was one of fact and (2) the court's factual findings that the statements were puffery are supported by the record. Those statements are:

- "Its blend of B-vitamins, amino acids and enzymes help you feel bright, alert, and focused." (Statement 1)

- "The blend of [B]-vitamins, amino acids, nutrients and caffeine in [5-HE] will give you the bright alert feeling you need to really get into it." (Statement 2)

- "It's simple * * * caffeine with vitamins and nutrients. It's the combination that makes it great. * * * Disclaimers: Provides a feeling of alertness and energy. Does not provide caloric energy." (Statement 3)

- "It contains a powerful blend of B-vitamins for a feeling of energy and alertness." (Statement 5)

As to those statements, we conclude that reasonable factfinders could differ as to precisely what those statements communicate about the effect of 5-HE (for example, what does it mean to have "the bright alert feeling you need to really get into it"?); how general or specific they are; and,

most significantly, on whether the statements are likely to induce reliance. In addition, although there is evidence in the record to support a finding that those statements were not puffery, there is also evidence in the record—Beale's testimony—to support the trial court's findings that they are. For that reason, with respect to those statements, the trial court did not err in treating the issue of puffery as one of fact and, further, did not err in finding that they were puffery based on the expert testimony.

With respect to the two remaining statements identified by the state, we conclude as a matter of law that those statements are not puffery. Those statements are:

- "It's packed with [B]-vitamins for energy and amino acids for alertness and focus. There is zero sugar, zero herbal stimulants, and only as much caffeine as a cup of premium coffee. The two-ounce energy shot takes just seconds to drink and in minutes you're feeling bright and alert. And that feeling lasts for hours." (Statement 4)

- "[5-HE] contains a healthy, powerful blend of B-vitamins for energy, amino acids for focus and better mood, and enzymes to help you feel it fast." (Statement 6)

Unlike the other statements, which are more general in their descriptions of the effect and function of the NCI, thereby creating an issue of fact as to whether they are puffery, these two statements make specific representations about the particular effects of the component parts of the NCI, telling consumers that B-vitamins affect energy and that amino acids affect focus and mood. Statement 6 makes an additional specific representation about the NCI, telling consumers that enzymes affect the rate at which the product's effect is felt. In addition, Statement 4 explicitly tells consumers how long they can expect the product's effect to last (hours). That representation, when viewed in the context of the representation that 5-HE contains only as much caffeine as a cup of premium coffee, is the sort of statement that a reasonable consumer would rely on when deciding between coffee and 5-HE as a source of caffeine. Contrary to the trial court's conclusion that the reference to "feelings" renders the statements subjective, read in context, defendants'

representations promise the consumer a physiological effect; whether the product has that effect is something that can be objectively tested. B-vitamins either supply energy, or they do not. Amino acids either improve focus and mood, or they do not. Enzymes either affect the rate at which the other ingredients in 5-HE affect the consumer, or they do not. The promised effect of the product either lasts for hours, or it does not. Unlike the four statements above, about which reasonable factfinders could have different views as to whether they were puffery, these two statements are so specific and objective in their representations about how the ingredients of 5-HE operate, that we conclude as a matter of law that a reasonable consumer would credit them and rely on them in making a decision about whether to purchase 5-HE. For that reason, they are not puffery. On this point, we note that Division 1 of the Washington Court of Appeals reached the same conclusion about a similar representation about how the NCI work, and we agree with that court's analysis. *See State v. Living Essentials, LLC*, 436 P3d 857, 863, 870 (Wash Ct App Div 1 2019) (concluding that 5-HE's advertising claim that "the key vitamins and nutrients in [5-HE] work synergistically with caffeine to make the biochemical or physiological effects last longer than caffeine alone" was not puffery because the representations were "factual representations that are capable of being tested").

We therefore reverse on the third assignment of error and remand to the trial court to determine whether the two statements that we have determined are not puffery are false, as the state alleges.

D.   *Fifth Assignment of Error: Whether the Trial Court Applied an Erroneous Legal Standard for Willfulness*

With respect to Count 1, the state sought civil penalties in connection with the alleged UTPA violations. To obtain civil penalties, it was required to prove that the alleged violations were willful, that is, that "the person committing the violation knew or should have known that the conduct of a person was a violation." ORS 646.605(10) (defining willfulness); ORS 646.642(3) (requiring proof of willfulness as a prerequisite to imposition of civil penalties). In other words, the state was required to prove that

defendants were at least negligent. *Stewart v. Albertson's, Inc.*, 308 Or App 464, 492, 481 P3d 978, *rev den*, 368 Or 138 (2021) (explaining that "a 'willful' violation * * * has been interpreted for UTPA purposes to mean negligence."). Although the trial court ultimately did not find that the state had proved any UTPA violations, negligent or otherwise, it determined further that, if any violations occurred, those violations were not willful.

The state challenges that conclusion regarding willfulness. It asserts that the trial court imposed an erroneous—and higher—legal standard for willfulness. It contends that the trial court's explanation of its verdict shows that "the court concluded that industry practices established the standard of care for whether defendants knew or should have known of the violations" and also that the court erroneously "concluded that defendants had no obligation to assess the validity of the study it commissioned and published, so producing advertisements based on the study could not have been a willful violation."

We are not convinced that the trial court applied a wrong legal standard to determine willfulness. The court correctly recited the standard for willfulness under the UTPA, explaining that it required proof that "[d]efendants knew or should have known that their conduct was a violation." The court noted that the state argued that the court should infer willfulness from "[d]efendants' lack of scientific expertise and failure to consult with anyone knowledgeable about the effects of B-vitamins, amino-acids and enzymes on human cognition when creating the product." The court then explained why it was not persuaded, on the record before it, that defendants' lack of consultation meant that they should have known that the 5-HE did not work as represented. Although defendants' evidence of industry practices no doubt played a role in the court finding the state's case unpersuasive, the court's reliance on that evidence does not indicate a misunderstanding of the UTPA willfulness standard, in view of the arguments advanced by the state.[3] Accordingly, we reject the state's fifth assignment of error.

---

[3] The state does not argue that the evidence of industry practices is irrelevant to the question of whether someone in defendants' position knew or should have known their representations were false.

E.   *Sixth Assignment of Error: Whether the Trial Court
     Applied an Erroneous Legal Standard in Denying Relief
     on Count 4*

In the sixth assignment of error, pertaining to
Count 4, the state argues that the trial court applied an
erroneous legal standard in assessing whether defendants'
"Ask Your Doctor" (AYD) advertising campaign contained
misrepresentations under ORS 646.608(1)(e). That para-
graph provides that a person engages in an unlawful trade
practice if, "in the course of that person's business, vocation,
or occupation, * * * the person represents that goods have
* * * approval * * * that [they] do not have." *Id*. For purposes
of the UTPA, a "representation" includes "any assertion by
words or conduct" and also "a failure to disclose a fact." ORS
646.608(2).

Defendant's AYD advertisements were television
and online ads that, with some variation, transmitted the
following message:

> "We asked over 3,000 doctors to review [5-HE] and what
> they said is amazing. Over 73% who reviewed [5-HE] said
> that they would recommend a low-calorie energy supple-
> ment to their healthy patients who use energy supplements.
> 73%. [5-HE] has four calories and is used over 9 million
> times a week. Is [5-HE] right for you? Ask your doctor. We
> already asked 3,000."

Defendants arrived at the 3,000-doctor count by
combining the results of two different surveys. The first
was a blind online survey of 503 doctors who were asked to
identify characteristics of an energy drink that they would
recommend, and the second was an in-person survey where
2,659 doctors were asked whether they would recommend
5-HE specifically. The results of the first survey indicated
that 73.6 percent of the doctors would recommend a low-cal-
orie energy product to their healthy patients who already
used energy supplements and that 47.7 percent would specif-
ically recommend 5-HE. In the second, 90 percent of doctors
would recommend a low-calorie energy supplement to their
patients who use energy supplements, and 74 percent would
recommend 5-HE specifically.

The state argued that the AYD campaign ran afoul of ORS 646.608(1)(e) by falsely representing that 3,000 doctors had been asked about 5-HE when 3000 doctors had not been asked about 5-HE specifically. In support of the claim, the state presented the testimony of an expert in consumer research who opined that it was inappropriate to combine the results of the two surveys because the surveys were not scientific—raising questions about the reliability of the results—and because the surveys used different methodologies.

The trial court, in discussing the evidence, noted that the AYD ads could be misleading because the first sentence suggests that all 3,000 doctors were asked whether they recommend 5-HE specifically when only 2,659 were asked that question. The trial court also noted that the second sentence referred to the results of the online survey of 503 doctors, but, in context, implied that it was referring to the results of a 3,000-doctor survey. Notwithstanding those features, the court found that the AYD ads did not purport to have been based on scientific or unbiased methodologies; found, based on expert testimony, that consumers expect bias in a survey procured by an advertiser; and concluded that the AYD ads did not breach the UTPA's prohibition on false representations because the "substantive message" of the ads was not misleading.

On appeal, the state asserts that the trial court based its ORS 646.608(1)(e) ruling on an incorrect legal standard. In support of that argument, the state points to the court's discussion of consumer expectations of bias, arguing that consumer expectations are irrelevant to the question whether a representation is true or false. The state asserts further that the trial court's consideration of consumer expectations essentially added an element to ORS 646.608(1)(e) that the legislature did not include.

Having reviewed the court's decision, we are not persuaded by the state's arguments. In particular, we are not persuaded by the state's argument that the court's discussion of the consumer-expectations evidence demonstrates that the court applied an incorrect standard in assessing

the state's claims that the AYD ads falsely represented that 5-HE had the approval of doctors that it did not have.

First, although the wording of the AYD ad might be described as slippery, it is difficult to conclude that the ad falsely represented that 5-HE had the approval of doctors because the ad does not say that. The ad states that "over 73%" of doctors "would recommend a low-calorie energy supplement to their healthy patients who use energy supplements" and does not state that they would recommend 5-HE. The representation about "over 73%" of doctors surveyed would so recommend also appears to reflect correctly the results of the two surveys. In the first survey, 73.6 percent of doctors would recommend such a supplement, and in the second, 90 percent would recommend such a supplement. In both instances, more than 73 percent of doctors generally would recommend a low-calorie energy supplement to patients already using supplements. This tends to undercut the state's argument that we should infer that the court misinterpreted ORS 646.608(1)(e) to require the state to prove that an ad is misleading, taking into account consumer expectations.

Second, in context, the court's discussion of consumer expectations appears directed to the materiality element the court had read into the statute, but which the Supreme Court has since rejected. As discussed, the court had concluded that the state needed to demonstrate that any misrepresentation was material to consumer purchasing decisions, and evidence of consumer expectations would have been relevant to the court's materiality assessment. Under those circumstances, the state has not shown that the court's determination rested on an erroneous legal standard.

F.  *Seventh Assignment of Error: Whether the Trial Court Applied an Erroneous Legal Standard in Denying Relief on Count 6*

In the seventh assignment of error, pertaining to Count 6, the state argues that the trial court applied an erroneous legal standard in assessing whether the AYD campaign—the same ads discussed above—caused a likelihood of confusion or misunderstanding under ORS 646.608(1)

(b). That paragraph provides that a person engages in an unlawful trade practice under the UTPA if the person "causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of" the goods. *Id*. The Supreme Court has explained that prohibited conduct under the paragraph occurs when a person "(1) produces or brings about (2) a probability (3) that another person will experience either (i) a lack of understanding or a misinterpretation, or (ii) a state of being that involves mental confusion, or being discomfited or disconcerted, or a diminished ability to distinguish or choose, regarding (4) the source, sponsorship, approval, or certification of * * * goods." *Living Essentials II*, 371 Or at 36-37.

In the trial court, the state argued that the AYD campaign caused a likelihood of confusion or of misunderstanding because the advertisements "presented the results of a survey in a deceptive manner that would lead consumers to believe doctors had approved of [5-HE] in a way that they had not." In support of that argument, the state pointed to evidence in the record showing that, of consumers who heard the AYD ad, 33.8 percent took away a message that doctors actually recommended 5-HE and 42.4 percent took away an incorrect message, such as doctors recommending a low-sodium energy supplement, which is not part of the ad. Rejecting that argument, the trial court determined that the AYD ad does not cause confusion or misunderstanding because the misleading nature of the ad "can only be gleaned by implication, as the plain [wording] of the ad is clearly limited." The trial court incorporated by reference its analysis for Count 4 (the subject of the sixth assignment of error on appeal) and found the substantive message of the AYD ad to not be misleading or confusing.

On appeal, the state argues that the trial court's analysis demonstrates that it applied the wrong legal standard in rejecting the state's claim on Count 6. It points to the fact that "the trial court did not expressly address [the causation] element in its verdict" and further argues:

> "Nor did the court explain why the state's evidence did not support a finding that defendants caused a likelihood of confusion when the state put on evidence that 33.8% of

individuals who viewed the ad would have received the message that doctors in fact recommended [5-HE] and another 42.4% of consumers received a message that was not supported by the plain text of the ad."

The state suggests that based on that evidence "it is clear" that the ad not only created a likelihood of confusion but that a "majority of consumers misunderstood or were confused by it."

As with the sixth assignment of error, we are not convinced that the court's order demonstrates that it applied an incorrect legal standard in denying relief on Count 6. Although somewhat opaque, the court's discussion of the evidence suggests to us that the court was not persuaded that defendant's AYD ad, as distinct from reader inattention or other causes, was the cause of any confusion about the ad's message about what doctors had approved. The state's specific claim was that the ad caused a likelihood of confusion as to whether doctors approved 5-HE in a way that they had not. The trial court expressly observed that "the plain language of the ad is clearly limited," an observation that indicates that the court was not convinced that the ad itself—rather than other potential causes—was the cause of any likely confusion.[4] The court's discussion of the expert testimony points the same direction:

> "The State further relies on Ms. Butler's consumer survey to suggest that the AYD ad is misleading because 33.8% of consumers surveyed indicated the message they received from the ad was that doctors recommend 5HE. However, another 42.4% of consumers indicated that the ad conveyed another message such as doctors recommend a low-sodium energy supplement. The remaining consumers either received the correct message from the ad or were unable to identify a message.

> "Ms. Butler explained the response to the 'noise questions,' which are questions about information unrelated to the advertisement, [are] designed to detect people who are merely guessing. The low sodium question is a noise

---

[4] We do not mean to suggest that a plainly worded ad cannot, as a matter of law, cause a likelihood of confusion; as was the case here, a party may produce evidence that would permit an inference that an ad with straightforward text that causes confusion as a factual matter.

question. Ms. Butler acknowledged that 'some studies showed 20 to 30 percent of people are taking away … a message—or a message from an ad that's not present … that it's a known fact that this phenomen[on] can occur.' Howard Beales confirmed this phenomenon."

That discussion also tends to suggest that the trial court simply was not persuaded that defendants' ad was the cause of any likelihood of confusion about what the doctors had approved, given the possibility of other causes, including the phenomenon described by Butler and confirmed by Beales. To be sure, the state's evidence in this case may have permitted the trial court to find that defendants' ad caused a likelihood of confusion. That the evidence may have permitted the court to find causation, however, does not mean that, on this record, the court was compelled to find that defendants' representations caused a likelihood of confusion, in view of the other evidence regarding potential sources of confusion. For that reason, the parts of the trial court's ruling that the state points to do not persuade us that the trial court applied an incorrect legal standard. In particular, they do not persuade us that the court misunderstood the legal standard that applies to the causation element of a claim under ORS 646.608(1)(b).

G. *First Cross-Assignment of Error: Whether, to Prove Falsity of a Scientific Representation for Purposes of ORS 646.608(1)(e), a Plaintiff Must Show that All Reasonable Experts Agree that the Representation is False*

Our conclusion that we must remand for further proceedings on Count 1 requires us to address defendants' first cross-assignment of error. In that cross-assignment of error, defendants contend that, because scientific expertise is required to evaluate the veracity of their representations, to prove that their statements about the properties of 5-HE violated ORS 646.608(1)(e), the state was required to prove that "all reasonable experts in the field agree" that 5-HE does not have the "characteristics, ingredients, uses, benefits, quantities or qualities" that defendants represented that 5-HE has. In support of that standard, defendants primarily rely on a Fourth Circuit case, *In re GNC Corp.*, 789 F3d 505, 516 (4th Cir 2015). There, the court held that,

to state a claim as to whether representations about certain characteristics of nutritional supplements were false, the plaintiffs were required to allege facts that would allow finding that all reasonable experts agreed that the representations were false. *Id*. at 516. They urge us to adopt that standard as a matter of Oregon law and to direct the trial court to apply that standard on remand.

We are not persuaded. Defendants point to nothing in the text, context, or legislative history of the UTPA that suggests that the legislature intended for a UTPA plaintiff to have to prove that all reasonable experts agree on whether a statement is a misrepresentation about a product's characteristics. Had the legislature intended to impose such a standard, or otherwise limit the factfinder's ability to determine whether a representation is true based on whatever competing evidence is presented, we think the legislature would have been express about it. *See*, *e.g.*, *Living Essentials II*, 371 Or at 43-44 (rejecting argument that a UTPA plaintiff must prove that alleged false or misleading representations were material to consumer purchasing decisions, where unambiguous text of statute did not require proof of materiality, and neither context nor legislative history provided support for argument that the court "should infer that the legislature implicitly intended to incorporate that requirement from other sources of law the legislators did not discuss").

Beyond that, to the extent federal court decisions are relevant to the construction of the UTPA, the state points out that the Ninth Circuit, among other courts, has rejected the Fourth Circuit's approach. In *Sonner v. Schwabe N. Am., Inc.*, 911 F3d 989, 993 (9th Cir 2018), the court declined to adopt the *GNC* reasoning when considering whether a plaintiff had presented sufficient evidence to create a dispute for the factfinder as to whether the defendant's representations about a nutritional supplement were false. The court ruled that "[i]f the plaintiff's evidence suggests that the products do not work as advertised and the defendant's evidence suggests the opposite, there is a genuine issue of material fact for the factfinder to decide." *Id*.

Although defendants argue that the Ninth Circuit's ruling is confined to the summary judgment phase of the proceeding and that plaintiffs would still have to satisfy the "all reasonable experts" standard at trial, the court's reasoning does not point in that direction. But even if it did, we remain unconvinced that the federal cases on which defendants rely supply a basis for inferring that the UTPA implicitly requires plaintiffs to satisfy the "all reasonable experts" standard when proof of a representation's falsity requires scientific evidence.

H.   *Third and Fourth Cross-Assignments of Error: Whether ORS 646.608(1)(e), As Applied to Defendants, Violates Article I, Section 8, or the First Amendment*

In their third and fourth assignments of error, defendants argue that it would violate their rights under Article I, section 8, and the First Amendment to hold them liable for UTPA violations. They raise both facial and as-applied challenges. The Supreme Court rejected defendants' facial challenges under both the Oregon and the federal constitutions. *Living Essentials II*, 371 Or at 44-59. The court did not reach defendants' as-applied challenges, reasoning that the parties' arguments were not "well-developed" and also that the disposition on remand might obviate the need to address the as-applied challenges. Accordingly, we must address the disposition of the as-applied challenges.

For reasons similar to those stated by the Supreme Court, we decline to resolve those challenges. The parties' arguments in support of the as-applied challenges remain undeveloped. In particular, it is not clear to us whether defendants are arguing solely that it would violate their constitutional rights to impose monetary penalties for their alleged false and misleading representations, or whether they are also arguing that it would violate their rights to bar them from continuing to make representations that are found to be false or misleading. Additionally, because the trial court has not yet found, and may never find, that defendants violated the UTPA, it would be premature and speculative for us to evaluate defendants' as-applied challenges. Absent the concrete details about what violations defendants were found to have committed, and what remedies were ordered,

we would be advising on significant principles of constitutional law without the benefit of the facts, and we decline to do so.

I.   *Cross-Appeal: Whether the Trial Court Erred in Determining that Defendants Were Not Entitled to Mandatory Attorney Fees under ORS 646.632(8)*

The first time this case was before us, defendants cross-appealed the supplemental judgment denying defendants' request for attorney fees under ORS 646.632(8). That subsection provides for mandatory fees to a prevailing UTPA defendant so long as the defendant provided a satisfactory assurance of voluntary compliance (AVC) to the state prior to the state's lawsuit alleging violations of the UTPA. *Living Essentials I*, 313 Or App at 204-05. The trial court concluded that defendants' AVC was not satisfactory and denied attorney fees for that reason. Defendants assigned error to that conclusion, arguing that their AVC was satisfactory as a matter of law such that the state had no legal basis to reject it. *Id*. at 208.

We agreed with defendants for two reasons. First, we determined that the AVC adequately provided restitution for persons who lost money as a result of the alleged deceptive trade practices. *Id*. 215-16. In so doing, we rejected the state's argument that the AVC was unsatisfactory under ORS 646.632(3)(a) on the ground that it did not specifically and independently provide restitution outside of a promised lump sum payment to the state. *Id*. at 215. Second, we rejected the state's argument that the AVC was unsatisfactory on the ground that defendants promised only to refrain from "material" representations. *Id*. at 217. We concluded that, even if the UTPA did not contain a materiality element as the state argued, other provisions of the AVC promised that defendants would obey the UTPA in full. *Id*. "In addition—and significantly—the AVC contain[ed] a severability clause" which allowed the AVC to remain in effect after severing the provision stating that defendants would refrain only from "material" representations. *Id*. We reversed the denial of attorney fees for the trial court to determine the amount of reasonable attorney fees and costs due to defendants. *Id*. at 218.

As we have explained above, the Supreme Court later held that the UTPA does not contain a materiality requirement and remanded the case to us to consider the state's additional arguments. *Living Essentials II*, 371 Or at 44. According to the state, that holding should cause us to reconsider our determination on the AVC's compliance with the UTPA if we reverse the trial court's judgment in any way because defendants would no longer be the prevailing party. The state argues that the AVC violates the UTPA because defendants promised to refrain from material misrepresentations, which is contrary to the UTPA.

We decline the state's invitation to reconsider our conclusion on the AVC, and we adhere to our original conclusion because the Supreme Court's decision does not undercut or change our previous analysis. We reasoned in our first opinion that, even if the UTPA did not contain a materiality element, the AVC was satisfactory because other provisions of the AVC promised full compliance with the UTPA and because any provision contrary to the UTPA would be severable. Given that reasoning, the Supreme Court's determination regarding materiality does not alter our conclusion that the AVC is satisfactory. We therefore adhere to that conclusion and our decision to reverse and remand the supplemental judgment.

We note that, in light of our partial reversal and remand, defendants are not, at present, prevailing parties. However, our remand to the trial court leaves the possibility that defendants prevail. In the event that they do, our conclusion that defendants' AVC was satisfactory means that defendants would be eligible for a discretionary award of attorney fees under ORS 646.632(8).

### III.   DISPOSITION

For the foregoing reasons, we reverse the general judgment as to Count 1 and remand for the trial court to determine (1) whether those representations that it deemed potentially false by implication are in fact false by implication; (2) whether those statements that the court erroneously determined were puffery are false; and, (3) if any of the representations are found to be false, what remedial

measures are warranted. We otherwise affirm the general judgment. The supplemental judgment denying attorney fees is reversed and remanded for further proceedings pending the outcome of the remand proceedings on the merits.

On appeal, general judgment reversed and remanded as to Count 1, otherwise affirmed; on cross-appeal, supplemental judgment reversed and remanded.